(No. 37186, 37575 Cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALLEN GOLSON *et al.*, Plaintiffs in Error.

*Opinion filed March 18, 1965.—Rehearing denied May 19, 1965.*

JAMES G. STAPLES, PHILIP F. PURCELL, and JAMES E. KNOX, JR., all of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE and WILLIAM J. NELLIS, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SOLFISBURG delivered the opinion of the court:

The defendants, Allen Golson and William Perkins, together with one George Wilson, were jointly indicted for the murder of John McAuliffe, and in another indictment for the murder of Benedetto Spizzirri. Wilson pleaded guilty to both indictments and was sentenced to death. His conviction was affirmed in *People* v. *Wilson,* 29 Ill.2d 82. The defendants, Golson and Perkins, were tried jointly by jury on each indictment. At the first trial, on the indictment charging them with the murder of McAuliffe, they were found guilty and Golson was sentenced to the penitentiary for a term of 50 years and Perkins was sentenced to life imprisonment. On the second trial, on the indictment charging the murder of Spizzirri, each defendant was found guilty and each was sentenced to the penitentiary for a term of 199 years. These 199-year sentences were not to commence until the expiration of the imprisonment under the

sentences imposed at the first trial. We issued writs of error to review the judgments of conviction in both trials and the writs of error have been consolidated.

One of the claims advanced by defendants is that the court erred in admitting in evidence confessions allegedly obtained by improper means. Golson did not move to suppress his confession at the first trial, and therefore its admissibility at the first trial is not in issue. But Perkins filed a motion to suppress certain confessions on the ground that they were obtained by police brutality. At the hearing on Perkins' motion to suppress, Perkins testified that he and Wilson were arrested between 8 and 9 o'clock on the evening of March 18, 1960, and were taken to police headquarters where he was interrogated by police captain Pape. According to Perkins, Pape told him that he already knew everything about the murder and that he had to have a confession quick. Perkins testified that Pape beat him in the stomach and around the heart and that an unidentified person hit him on the back of his neck. These beatings lasted for approximately 15 minutes, after which he was taken into an adjoining room where Wilson was being held. He testified that between midnight and 1:00 the following morning he was taken to the State's Attorney's office where he was further questioned and that at about 2:30 in the morning he made a statement because he was in fear of further bodily harm. About 15 minutes later he made a joint statement with Wilson. On the morning of March 19 he was taken to a doctor for examination. He told the doctor that he was bruised under his heart and the doctor examined him in that area. On the morning of March 21 he was taken to the State's Attorney's office where he signed a joint confession with Golson and Wilson. He had not talked to an attorney at any time until after this joint confession was given. On cross-examination he testified that after the beating he told Pape he would talk and that he then told Pape that Wilson had done the actual shooting.

He testified that 20 or 30 minutes after the beating he told the police all of the details of what happened on the night of the crimes. When he was examined by the doctor he did not tell him of pain anywhere other than under his heart.

In rebuttal the State called Captain Pape who testified that Perkins voluntarily confessed that he, Golson and Perkins had stolen some mail sacks and that two postal inspectors had been shot by Wilson when the inspectors apprehended the three men a short distance from the scene of the theft. Pape testified that neither he nor anyone in his presence had struck Perkins. Pape testified that police officers Steiner and O'Malley, and postal inspector Dunne were present at his interrogation of Perkins. All of these persons testified at the hearing and confirmed Pape's testimony that no violence had been used.

The doctor who had examined Perkins testified that he had conducted a complete examination and found nothing except a pin-point tenderness just below the left breast.

Two police officers testified that they had also been with Perkins during his confinement in the police station on the night of March 18, and that neither they nor anyone in their presence had struck Perkins. An assistant State's Attorney testified that in the early morning of March 19 he took the statements from Perkins and that he took one statement from him on the morning of March 21. At the second trial no evidence was heard on Perkin's motion to suppress his confession and there was no indication that there was any additional evidence to offer. On the basis of the evidence heard on the motion at the first trial the court denied Perkins's motion to suppress at the second trial.

The question of the admissibility of a confession is for the trial court to decide and the court is not required to be convinced of its voluntary character beyond a reasonable doubt. The decision of the trial judge will not be disturbed unless manifestly erroneous. The great weight of the evidence showed that there was no force exerted to obtain

Perkins's confessions and it is clear that there was no prolonged detention and questioning. In *People* v. *Wilson,* 29 Ill.2d 82, where Wilson alleged that he was beaten by Capt. Pape, we held that the trial judge did not err in ruling that his confessions were voluntary. In our opinion the trial judge did not err in ruling in the present case that Perkins's confessions were voluntary.

Defendant Perkins also argues that his confessions were inadmissible because the State did not call all of the witnesses who were present at the time his confessions were made. The evidence showed that when Perkins made his statements in the early morning of March 19, three persons were present who did not testify at the hearing and also showed that on March 21, when he signed his joint confession with the other two defendants, a detective and a court reporter were present who did not testify at the hearing. The rule is well settled that all material witnesses must testify at a hearing to determine whether a confession is voluntary. However, in *People* v. *Freeman,* 25 Ill.2d 88, where the State did not call certain witnesses who were present at the time a confession was signed, we held that where there was no claim of coercion at the time a written confession was executed, but only the claim by the defendant that he was in fear of further beatings, the State was not required to call all of the witnesses present at the time the defendant signed the confession. (See also *People* v. *Joe,* 31 Ill.2d 220, 226; *People* v. *Sims,* 21 Ill.2d 425, 433.) The ruling in these cases is applicable here. There is no claim of coercion at the time Perkins signed the confession and the State was not required to call all of the witnesses who were present at the time of the signing.

Both defendants contend that their confessions were inadmissible on the first trial because they were obtained while they were in police custody without the assistance of counsel. The defendants rely on *Escobedo* v. *Illinois,* 378

U.S. 478; 84 S. Ct. 1758, 12 L. ed. 2d 977. The defendants concede that in the present case they did not request counsel. In *People* v. *Hartgraves,* 31 Ill.2d 375, we held that in the absence of evidence of improper conduct by the authorities a confession is admissible even though obtained in the absence of counsel where the accused has made no request for counsel, and we further held that the authorities were not under a duty to advise an accused of his right to counsel and his right to remain silent. Our holding in the *Hartgraves* case is applicable here and we find no error in the admission of the confessions.

Another claim advanced by each defendant is that the court erred in denying a petition for a change of venue. The record shows that the petition for a change of venue was not made until after the court had denied a motion by both defendants to quash the indictment, partially denied their motion for a bill of particulars, and had denied their motion for a continuance to avoid the effect of alleged adverse newspaper publicity. In addition, the court had previously denied Perkins's motion to suppress his confession. In *People* v. *Wilson,* 29 Ill.2d 82, we reiterated the well settled rule that petition for a change of venue after the court has ruled on any matter going to the merits of the case comes too late. There was no error in the denial of the petition for a change of venue in the present case.

Each defendant contends that the first judgment of conviction must be reversed because of an instruction given by the court over the defendants' objection. A determination of this question requires a summary of the evidence. From the joint statement of March 21 signed by Perkins, Golson and Wilson, the following facts appear: About two weeks before the murders Wilson had bought a gun and shortly before the crimes Wilson, in the company of Perkins and Golson, bought a clip for the gun. On the night of the crimes the 3 men set out in a car jointly owned by Perkins and

Wilson with the intention of stealing from automobiles. Wilson put the gun under the dashboard. They did not find any autos to rob and drove around looking for something else to steal. One of the men said that he had seen some boxes on a loading dock and, after circling the dock three times in the car they stopped and Wilson and Golson each took a mail sack from the dock and placed them in the car. They had only driven a short distance from the dock when two postal inspectors drove up beside them and ordered them to stop. One of the inspectors was armed with a gun. The inspectors looked in the back seat of the car and saw the mail sacks and told the three men to get out. They leaned them up against a railing and searched them, following which the three men and the two postal inspectors got into the inspectors' car and drove around the corner where they stopped. One of the inspectors asked Wilson to get out of the car and help him start Wilson's car. When Wilson got into his car he retrieved the gun from its hiding place under the dashboard and hid it on his person. He helped the inspector move the mail bags into the inspectors' car and then got in the back seat of the inspectors' car with the other two defendants. According to Perkins he then heard a click and saw that Wilson had the gun in his hand. Perkins said "No", but Wilson started shooting. According to Golson, when he heard the gun click he said to Wilson, "Please don't do this. Let him take us to jail." In the statement Wilson said that he raised the gun and pulled the slide back so as to cock it and pointed the gun at the inspectors and told them to be still. One of the inspectors eased his hand out of his pocket and the other inspector turned around and hit at Wilson's gun and Wilson started shooting. After Wilson shot the two inspectors he and Perkins escaped from the scene in their car, which could be driven without keys. It does not appear from the statement how Golson escaped except that he did not leave with the other two men. Several days after the shooting Golson contacted Wil-

son and attempted to pawn Wilson's gun. He was unsuccessful but thereafter Wilson did pawn the gun.

The facts contained in the statement are corroborated by the testimony of several witnesses. While not all of these witnesses testified to the entire transaction, their evidence may be summarized as follows: At the time of the shooting the witnesses saw a white man holding a gun on three colored men, identified as the defendants and Wilson. Wilson and one of the men got into Wilson's car and later the two white men took mail sacks out of Wilson's car and placed them in the inspectors' car. The two white men then put the three defendants in the back seat of their car and they got into the front seat. One of the witnesses heard gunfire and saw two of the men run to Wilson's car and another man run to a bus. Two police officers testified that they arrived at the scene shortly after the shooting and found both inspectors fatally wounded in the car. They also found mail sacks in the inspectors' car. One of the officers found a piece of paper with Wilson's license number written on it and another officer found Wilson's car keys in the pocket of one of the inspectors. One of the officers retrieved the gun from the pawn shop where Wilson said he had pawned it, and it was established that this was the gun that had been used by Wilson.

The case against Perkins and Golson, neither of whom had fired the shots that killed the two inspectors, was based upon the theory that the three men had conspired together to commit an unlawful act and that all of the conspirators were equally guilty of the murders which occurred during this act. This theory was based upon the doctrine commonly referred to as felony-murder, which has been defined as follows: "Where the unlawful act agreed to be done is dangerous or homicidal in character, or if its accomplishment will necessarily or probably require the use of force and violence which may result in unlawfully taking the life of another, every party to such agreement will be held crimin-

ally liable for whatever any of the co-conspirators may do in furtherance of the common design, whether or not he is present." *People* v. *Suddeth,* 374 Ill. 132, 135.

In the present case the instruction which is claimed erroneous was as follows: "The Court instructs the jury, as a matter of law, that in this case to constitute the crime of murder it is not necessary for the State to show that it was or may have been the original intent of the defendants or their co-conspirator or any of them to kill the deceased, John P. McAuliffe. It is sufficient if the jury believe from the evidence beyond a reasonable doubt that the defendants and their co-conspirator combined to do an unlawful act, such as to steal from the United States mails and that the deceased was killed by a co-conspirator in an attempt to execute such purpose."

The defendants argue that the felony-murder doctrine applies only in cases where the conspirators have conspired to commit a forcible felony, which by nature is dangerous to human life. They argue that theft from the U.S. mails by stealth is a nonforcible felony which would not normally involve any danger to human life. From this premise they argue that the conspiracy to commit this nonviolent felony cannot render the conspirators guilty of a murder committed by a co-conspirator. The felony-murder doctrine has apparently been applied in this State only to cases involving so-called violent felonies. (See Committee Comments following sec. 9—1 of the Criminal Code of 1961, Smith-Hurd Illinois Annotated Statutes, chap. 38, p. 398.) The argument of the defendants also finds some support in the decisions of this court. In *Lamb* v. *People,* 96 Ill. 73, several persons conspired to commit burglary. After the burglary was completed, some of the men took the property obtained in the burglary to a pawn shop with the intent of selling it to the owner of the shop. As they were in the act of unloading the goods, a policeman approached and was shot by one of the burglars. There was evidence that the defendant,

although one of the original conspirators, was not present at the time of the shooting. The defendant requested an instruction to the effect that unless the jury believed that the defendant was present at the homicide, or aided, abetted and encouraged the person who committed the homicide, or unless the jury should find that the defendant counselled and advised the persons who were disposing of the goods to kill anyone who would attempt to interrupt them, they should acquit the defendant. The trial court refused the instruction and this court held, with three members dissenting, that the refusal was reversible error. In *People* v. *Faught,* 343 Ill. 312, the defendant and another illegally attempted to purchase intoxicating liquor and in the course of the purchase a gun battle ensued and the seller of the liquor was killed. The court gave an instruction practically identical to the instruction in the present case. The conviction was reversed, and the court stated that the proposed purchase of liquor, although illegal, did not contemplate the destruction of human life, or even the use of force in any degree. It was pointed out that the jury might infer from the instruction that even if the shooting was in self-defense, or if the homicide was the independent act of one of the confederates and foreign to the common design, the defendant should be found guilty of murder. The latter case may be distinguished from the present case in that there was considerable evidence in that case tending to show that the shooting was in self-defense, an element which is not present here. The *Lamb* case may be distinguished on the ground that the shooting occurred, not during the commission of the crime, or in an attempt to escape from the scene of the crime, but in an attempt to dispose of the stolen goods. In our opinion the test to be applied in determining whether the felony-murder doctrine is applicable is not whether the felony is normally classified as non-violent, but is whether, under the facts of a particular case, it is contemplated that violence might be necessary to enable the conspirators to carry out their com-

mon purpose. (*People* v. *Brown*, 26 Ill.2d 308.) In *People* v. *Bongiorno*, 358 Ill. 171, the defendant and another conspirator committed an armed robbery. During the course of the robbery a police officer entered and the defendant's companion escaped through a window. The defendant was arrested and as he was being escorted down a hallway the defendant's accomplice approached and shot the officer in the back. The defendant contended that he was not guilty of murder because he did not fire the shot; that about 5 minutes had elapsed after the robbery had been completed; that the evidence failed to show a previous plan or design to kill; and that he had neither aided nor abetted in the killing. We affirmed the judgment of conviction and pointed out that it was a recognized principle that where two or more persons engage in a conspiracy to commit robbery and an officer is murdered while in immediate pursuit of either or both of the offenders who are attempting to escape from the scene of the crime with the fruits of the robbery, each of the conspirators is guilty of murder, for the crime had not been completed at the time inasmuch as the conspirators had not won their way to a place of safety. We pointed out that a plan to commit robbery would be futile if it did not comprehend an escape with the proceeds of the crime, and that unless the plan was to kill any person attempting to apprehend the conspirators at the time of or immediately upon gaining possession of the property, the plan would be inane. In the present case the evidence showed that all three men had participated in the purchase of a clip for Wilson's gun and that they all knew that Wilson had secreted the gun in the car before they embarked on their illicit scheme. The postal inspectors were shot a short distance from the scene of the theft while the conspirators were attempting to escape from that scene. There is sufficient evidence from which the jury could infer that the conspirators intended to forcibly resist any attempt to arrest them, either during the course of the crime or in an attempt to escape

from the scene. Such a plan comes within the doctrine of felony-murder, since it was contemplated that violence might be necessary to enable the conspirators to carry out their common purpose. There were other instructions given by the court on the subject and no complaint is made concerning these instructions. In our opinion the instruction in question, when considered with the other instructions and the facts in the case, was not improper or misleading and the giving of the instruction does not constitute reversible error.

The defendants also urge that the convictions in the first trial must be reversed because of prejudicial testimony and argument concerning the family of the deceased. In that trial, McAuliffe's widow testified that she was presently living with her two children, aged 12 and 8, and that she had last seen her husband at around 3 o'clock in the afternoon on the day of the crime and that she next saw his body at the funeral home. In defense counsel's argument, counsel said that he was sympathetic with Mrs. McAuliffe because she had lost her husband. He told the jury that he thought that it was audacious of the prosecutor to suggest the death penalty and told the jury that they should not take that which they could not give. He challenged the prosecutor to justify the "ridiculous" demand for the death penalty. In reply, the prosecutor referred to defense counsel's statement that the jury should not take that which they could not give and said that a person could give life and bear a child who would grow up and have his own family and children. Counsel objected and the court overruled the objection with the comment that defense counsel had brought this argument on. The prosecutor then repeated his remarks about the deceased having a family and reminded them that Mrs. McAuliffe had testified that she had two children. An objection to this remark was sustained. The prosecutor then referred to the fact that the following Sunday was Mother's Day.

We have reversed judgments of conviction of murder where undue prominence was given to the fact that the de-

ceased had left a family, where it appeared that this evidence and argument was used solely for the purpose of prejudicing and inflaming the jury. (*People* v. *Dukes,* 12 Ill.2d 334; *People* v. *Bernette,* 30 Ill.2d 359.) However, we have also refused to reverse convictions where objection has been made to testimony and argument concerning the deceased's family. In the recent case of *People* v. *Brown,* 30 Ill.2d 297, the prosecutor referred to the fact that the deceased's wife was now a widow and that his children were orphans. We held that the statement was not reversible error and pointed out that the widow had testified solely for the purpose of identifying the deceased. We also pointed out that the first reference to the decedent's children was made by defense counsel who expressed his sympathy to the widow and her children. In our opinion the testimony and the argument were not of such a nature as to require reversal of the judgment of conviction at the first trial.

Having fully examined the record pertaining to the first convictions of both defendants, we feel that no reversible error has been committed, that the evidence supported the jury verdicts, and that the convictions of the defendants must be affirmed.

Defendants next contend that their trial on the second indictment subjected them to double jeopardy and was so fundamentally unfair as to deprive them of due process of law. Such a claim was made by a plea in bar prior to the second trial, which plea also alleged that the State's Attorney publicly stated that he was seeking a second trial to cause greater penalties to be imposed on defendants. The plea in bar was denied by the trial judge although he accepted as true the allegation that the second trial was sought only for the purpose of obtaining greater punishment.

Under the decisions of this court, it is clear that the two indictments charged separate and distinct offenses, and the traditional plea of double jeopardy does not apply. (*People*

v. *Ciucci,* 8 Ill.2d 619; *People* v. *Allen,* 368 Ill. 368.) However, the fundamental unfairness of repeated trials for the same illegal conduct is apparent and has troubled the conscience of the courts and the legislature. In the *Ciucci* case we permitted multiple trials for the murder of defendant's wife and three children. Upon *certiorari* the United States Supreme Court upheld our decision in a *per curiam* opinion with four Justices dissenting. Two other Justices indicated that proper evidence of an intent on the part of the State to retry the defendant until a death sentence was obtained might establish such fundamental unfairness as to be a violation of due process of law. *Ciucci* v. *Illinois,* 356 U.S. 571, 2 L. ed. 2d 983.

In 1961, the Illinois legislature, mindful of the *Ciucci* case, adopted the Criminal Code of 1961 which provided a pattern for multiple prosecutions as follows:

"(a) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense.

"(b) If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution, except as provided in Subsection (c), if they are based on the same act.

"(c) When 2 or more offenses are charged as required by Subsection (b), the court in the interest of justice may order that one or more of such charges shall be tried separately." Ill. Rev. Stat. 1963, chap. 38, par. 3—3; see Committee Comments, Smith-Hurd Anno. Stat. 1963, chap. 38, par. 3—3, pp. 124-131.

In reviewing this record we find that these defendants were tried twice for the identical misconduct—the participation in an illegal venture in which a co-conspirator killed two men. Both juries were qualified to render the death penalty, both juries were presented with the same evidence

of the two killings, both juries heard the testimony of the two widows, and heard reference to their children.

At the beginning of the first trial defendants sought to consolidate the trials and were refused. Prior to the second trial defendants' plea ·in bar was refused despite the acknowledgement by the trial judge that the second trial was for the mere purpose of imposing a greater penalty.

These defendants were once convicted and a sentence determined by a jury who had before it all the evidence relating to the conduct of defendants and the two killings. No purpose was served or could be served by the second trial except the imposition of a greater penalty. We must also note that while Ciucci killed four people, these defendants engaged in but a single act of misconduct. To determine, as a matter of legal semantics, that two indictable offenses were committed does not make these multiple trials fair, or vary the fact that defendants were guilty of only one punishable course of conduct.

In this case it is apparent that the State wishes to substitute its opinion of the adequacy of punishment for defendants' misconduct for that of the original jury. We feel that fundamental fairness to the accused cannot permit a second trial in this case.

Because of the view we have taken on the second trial we have not considered the other allegations of error raised by the defendants relating to that second trial.

The judgment of the trial court upon the first indictment is accordingly affirmed and the judgment on the second indictment is reversed.

*Affirmed in part and*
*reversed in part.*