Docket No. 100257.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
ROBERT KLEBANOWSKI, Appellant.

*Opinion filed June 22, 2006.*

JUSTICE FREEMAN delivered the judgment of the court,
with opinion.

Chief Justice Thomas and Justices Fitzgerald, Kilbride,
Garman, and Karmeier concurred in the judgment and opinion.

Justice McMorrow dissented, with opinion.

**OPINION**

Following a bench trial, the circuit court of Cook County found defendant, Robert Klebanowski, guilty of armed robbery (720 ILCS 5/18–2 (West 2002)) and first degree murder based on the commission of a felony (720 ILCS 5/9–1(a)(3) (West 2002)). The circuit court sentenced defendant to 20 years of imprisonment for the murder but did not enter judgment on the armed robbery charge. The appellate court affirmed. No. 1–04–0119 (unpublished order under Supreme Court Rule 23). We granted defendant leave to appeal (177 Ill. 2d R. 315) and now affirm the judgment of the appellate court.


BACKGROUND

On February 7, 2002, Chicago police officers arrested defendant in connection with the armed robbery of Gary Szparkowski and the death of Robert Winters. Defendant waived his constitutional rights and gave a statement that was handwritten by the assistant State's Attorney. Subsequently, defendant gave a videotaped statement. Defendant stated that he had been living in a Cloud 9 motel for five days. Winters also lived at the motel, with his girlfriend, Carla Mitchell. On February 7, 2002, Winters burglarized a home, taking $180 and two handgun-style BB guns, one black and one silver. Mitchell refused to allow Winters to keep the BB guns in their motel room. Consequently, Winters gave the BB guns to defendant for safekeeping, along with $20 from the proceeds of the burglary. Later that day, Winters returned for the black BB gun. He asked defendant to give him a ride to the city because he wanted to "make up some money–rob somebody." Defendant agreed and gave Winters a ride in defendant's black Chevrolet pickup truck. Defendant and Winters drove around the city until Winters spotted a red vehicle pulling into a garage off the alley at 5128 S. Narragansett Avenue. With the BB gun at his waist, Winters ran toward the garage to rob the driver of the vehicle. Defendant stayed in the Chevrolet pickup truck, parked on the street by the alley, until he heard gunshots. Assuming that Winters had been shot, defendant left the scene and returned to the Cloud 9 motel. At the motel, defendant told Mitchell that Winters had attempted to rob someone and he

believed that Winters had been shot. Mitchell asked defendant to give her a ride back to the area. The police being already at the scene, defendant dropped Mitchell off a couple of blocks away and returned to the motel.

In the videotaped statement, defendant was asked: "Now, if he was gonna get money from that man you were assuming he was going to give you some of that, right?" Defendant answered: "That was, was possible, yeah." In the handwritten statement, however, defendant stated positively that Winters was going to give him some of the proceeds from the robbery. Also in the handwritten statement, defendant stated that his job was to be the getaway driver.

Charged with armed robbery and felony murder, defendant pled not guilty and waived trial by jury. At the ensuing bench trial, Gary Szparkowski, a lieutenant in the Chicago police department, testified that on February 7, 2002, his shift ended at 6:30 p.m. He went to a restaurant dressed in civilian clothes, and returned to his home at 5128 S. Narragansett Avenue at approximately 10:10 p.m. He accessed his garage from the alley, backed his pickup truck into the parking space, and exited the vehicle. Just as he closed the door of the pickup truck, Winters placed a gun to the middle of his forehead. Lieutenant Szparkowski ducked, grabbed the barrel of the gun with one hand while attempting to access his own gun with the other hand. Winters regained control of the gun, however, and placed the gun at the top of Lieutenant Szparkowski's head. He demanded that Lieutenant Szparkowski give him his wallet, and Lieutenant Szparkowski complied. Winters then turned and ran from the garage with the wallet in hand. Within a couple of seconds, Lieutenant Szparkowski recovered, drew his gun and gave pursuit. Lieutenant Szparkowski announced his office and ordered Winters to stop. Winters, who was approximately 25 feet down the alley, stopped and turned, with the wallet in one hand and the gun pointed in Lieutenant Szparkowski's direction. Lieutenant Szparkowski fired two or three shots at Winters. Winters turned and took a few more steps. Lieutenant Szparkowski continued to fire until Winters fell face first to the ground and dropped the gun. Lieutenant Szparkowski identified the black BB gun, which resembled a .357 Magnum, as the

weapon Winters used in the robbery. Lieutenant Szparkowski also identified his wallet and stated that, at the time of the robbery, he had $50, his credit cards, and his identification cards in the wallet.

Joseph McInerney, a Chicago police officer, testified that at approximately 10:10 p.m. on February 7, 2002, he heard a dispatch that an officer was in danger and shots had been fired at 5128 S. Narragansett Avenue. He arrived at the alley two to three minutes later and found Winters face down on the ground, with a gun approximately three feet away. Lieutenant Szparkowski's wallet was not then in sight. Officer McInerney called for an ambulance. When the paramedics arrived, they rolled Winters onto his back to provide medical aid to him. Lieutenant Szparkowski's wallet was underneath Winter's body.

Detective Tom Kelly of the Chicago police department testified that he arrived at 5128 S. Narragansett Avenue at approximately 10:45 p.m. Fifteen minutes later, he observed a woman, later identified as Mitchell, lift the police tape and run toward the police officers. Mitchell yelled that Winters was her boyfriend. Following a conversation with Mitchell, Detective Kelly proceeded to the Cloud 9 motel, looking for defendant and a black, late model Chevrolet pickup truck. In the motel parking lot, Detective Kelly saw a 2002 Chevrolet S-10 pickup truck, matching the description given by Mitchell. The license plate revealed that the pickup truck belonged to defendant. Detective Kelly then asked the motel desk clerk to identify the owner of the pickup truck and the room in which he was staying. The desk clerk directed Detective Kelly to defendant's room. Defendant identified himself and Detective Kelly placed him under arrest.

Joseph Bembynista, a Chicago police officer, processed the scene in the alley at 5128 S. Narragansett Avenue. He photographed the various bullet wounds on Winters' body, Szparkowski's wallet, and what appeared to be a gun, with the chamber area and barrel separated. He also recovered nine cartridge cases from the alley and a fired bullet that had gone through a nearby garage wall and lodged in a coffee can. Officer Bembynista identified the gun recovered from the alley

as a Crosman 357 CO$_2$-powered pistol, capable of firing a .177-caliber pellet or a steel BB. Officer Bembynista found no evidence in the alley that the BB gun had been discharged.

The trial then proceeded by way of stipulation. Barry Lifshultz, an assistant Cook County medical examiner, performed an autopsy on Winters' body and would testify that Winters died of multiple gunshot wounds. Curt Murray, an expert in firearms identification, would testify that the nine cartridge cases recovered from the alley were all fired from a nine-millimeter Luger, matching Lieutenant Szparkowski's gun. Judy Townsend, a paramedic with the Chicago fire department, would testify that she and her partner rolled Winters over in an attempt to perform lifesaving procedures. Winters was not breathing at the time. The trial judge allowed the stipulations and admitted them into evidence. The trial judge also admitted into evidence the State's exhibits including the autopsy report, the BB gun, and defendant's statements.

The trial court found defendant guilty of armed robbery. Specifically, the trial judge found that the BB gun Winters used in the armed robbery was a bludgeon. The trial judge also found that defendant aided and abetted Winters in the planning and commission of the armed robbery. According to the trial judge, defendant "provided the platform, the mobile platform that moved both Mr. Winters and the weapon into the area where the lieutenant was." Next, the trial court found defendant guilty of felony murder based on the predicate offense of armed robbery. The court found that Winters was killed during the commission of the armed robbery and defendant was responsible for the death under principles of accountability. The trial judge sentenced defendant to 20 years of imprisonment for the felony murder but did not enter a judgment or sentence for the predicate offense of armed robbery.

The appellate court affirmed. The court first rejected defendant's argument that he was not legally responsible for the armed robbery. The court noted that defendant drove Winters around until Winters spotted a person to rob. Further, when Winters exited the pickup truck, defendant knew that Winters intended to rob Lieutenant Szparkowski. Defendant

believed that Winters would give him part of the proceeds and waited for Winters' return. The court also noted that defendant did not withdraw from the criminal enterprise by depriving his prior efforts of effectiveness, giving timely warning to law enforcement officials, or making a proper effort to prevent the commission of the armed robbery. Next, the appellate court rejected defendant's argument that escape is not an element of armed robbery, and he could not be held responsible for a murder that occurred after the completion of the armed robbery. The court noted that if a killing occurs in the course of an escape from a robbery, the escape is within the operation of the felony-murder rule. Lastly, the court noted that a conviction for felony murder requires that the victim's death be the direct and proximate result of the defendant's felony. The court concluded that "defendant's knowingly unlawful actions in transporting both Winters and the weapon to the area where Szparkowski was robbed set in motion a chain of events leading to Winters' death."

We granted defendant's petition for leave to appeal. 177 Ill. 2d R. 315.


ANALYSIS

In his brief on appeal, defendant argues the evidence was insufficient to prove him guilty of armed robbery. Particularly, defendant argues that the BB gun Winters used was not operable and could not be considered a weapon for armed robbery purposes. Defendant also argues that, by leaving the scene when he heard gunshots, he withdrew from the armed robbery and could not be held accountable for Winters' actions. Lastly, defendant argues the State did not show that he had the specific intent required for the commission of armed robbery. At oral argument, however, defendant admitted his liability for the armed robbery. Defendant's counsel specifically stated: "Mr. Klebanowski did know there was a robbery, yes Judge. We are not contesting Mr. Klebanowski's accountability for the offense of armed robbery." Yet later, in rebuttal, defendant's counsel stated: "I hope it is clear to this court that Mr. Klebanowski is not arguing his accountability for the armed robbery." In light of defendant's concession, we consider only

the arguments related to defendant's conviction for the crime of felony murder.

Defendant argues that he should not be held accountable for felony murder because Winters was killed after the armed robbery had ended. Citing *People v. Dennis*, 181 Ill. 2d 87 (1998), defendant maintains that neither flight from pursuing victims nor escape is included as an element of robbery. Thus, according to defendant, the armed robbery, and defendant's participation in the criminal enterprise, ended when Winters exited the garage with the wallet in hand. Winters' subsequent death could not be considered a felony murder because the predicate felony of armed robbery ended before Lieutenant Szparkowski shot and killed Winters.

It has long been the rule in Illinois that a defendant may be held responsible for a death that occurs during an escape following the commission of a forcible felony. Thus, in *People v. Bongiorno*, 358 Ill. 171 (1934), the court affirmed Bongiorno's conviction for felony murder based upon the predicate offense of armed robbery. Bongiorno and Ross King entered an office suite and ordered all present to stick up their hands. Bongiorno closed the door and stood with his back to it. King proceeded to take all valuables from the victims as well as from a safe. An employee evaded the felons and notified police officer Redlich of the robbery. When Redlich ordered the felons to open the door, King escaped through a window. Redlich arrested Bongiorno and marched him down the hallway to the elevators and stairwell. As Redlich stood with his back to the stairwell, King came up the stairway and fired three shots, killing Redlich.

In appealing his conviction, Bongiorno insisted that he was not a participant in the murder; that he was then under arrest and in the custody of an officer; that the robbery was completed; that the evidence failed to show any previous design or plan to kill; and that he neither aided nor abetted in the killing. The court rejected these arguments, reasoning:

> "It is also a recognized principle of law that where two or more persons are engaged in a conspiracy to commit robbery and an officer is murdered while in immediate pursuit of either or both of the offenders who are

attempting escape from the scene of the crime with the fruits of the robbery, either in possession of one or both, the crime of robbery is not complete at the time of the murder, inasmuch as the conspirators had not then won their way, even momentarily, to a place of temporary safety, and the possession of the plunder was nothing more than a scrambling possession. [Citation.] Here the uncontradicted evidence shows that the conspirators designed to commit the crime of robbery through the use of a deadly weapon. That use included the intimidation of the victims and the means of the offenders' escape. Under such circumstances the intent to kill, if necessary, in obtaining and carrying away the loot is established. A plan to commit robbery would be futile if it did not comprehend an escape with the proceeds of the crime. These factual circumstances are inseparable. Unless the plan of robbery is to terrify the victim, and, if occasion requires, to kill any person attempting to apprehend them at the time of or immediately upon gaining possession of the property, it would be inane and child-like. Here Bongiorno was attempting to gain his release and make his escape from the scene of the crime not by the use of a deadly weapon, for he had none, but his endeavors were by persuasion and false representations. He knew that his co-conspirator was armed with a gun. He knew that he had gone out of Compton's office. He saw him come up the stairway with gun in hand, behind the officer, and shoot him in the back. He gave no warning of King's approach, but when the officer reeled and fell he ran and attempted to hide away. He concealed himself until he was arrested by other police officers. It is vain to argue that the killing was not included as a part, if necessary, in the commission of the crime which both Bongiorno and King had deliberately planned." *Bongiorno,* 358 Ill. at 173-74.

In *People v. Hickman*, 59 Ill. 2d 89 (1974), police officers were conducting surveillance at a warehouse. Three conspirators accessed the warehouse by removing a panel and

a lock from the side door. When they exited the warehouse, the officers closed in. On seeing the officers, the conspirators fled. In the ensuing pursuit, one officer shot and killed another, mistakenly believing that the victim was one of the conspirators. The jury found two of the conspirators guilty of burglary and murder. The trial court, however, entered an order arresting the judgment of murder. The appellate court reversed. In affirming the judgment of the appellate court, this court reasoned:

> "Here defendants planned and committed a burglary, which is a forcible felony under Illinois law. [Citation.] One of them was armed. It was their conduct which occasioned the presence of the police. When confronted by approaching officers, the defendants elected to flee. We have previously held that the period of time and activities involved in escaping to a place of safety are part of the crime itself. [Citation.] The defendants were repeatedly told to halt and the police identified themselves, but the defendants continued their attempt to escape. The commission of the burglary, coupled with the election by defendants to flee, set in motion the pursuit by armed police officers. The shot which killed Detective Loscheider was a shot fired in opposition to the escape of the fleeing burglars, and it was a direct and foreseeable consequence of defendants' actions. The escape here had the same effect as did the gunfire in [*People v. Allen*, 56 Ill. 2d 536 (1974)], in that it invited retaliation, opposition and pursuit. Those who commit forcible felonies know they may encounter resistance, both to their affirmative actions and to any subsequent escape. As we indicated in a recent felony-murder case, 'It is unimportant that the defendants did not anticipate the precise sequence of events that followed upon his entry into the apartment of Judy Tolbert. His unlawful acts precipitated those events, and he is responsible for the consequences.' *People v. Smith*, 56 Ill. 2d 328, 333-334." *Hickman*, 59 Ill. 2d at 94.

See also *Allen*, 56 Ill. 2d at 545 (where the conspirators ignored a directive to stop and a police officer was shot in an exchange of gunfire, the court held that the defendant was liable for the death "whether the fatal shot was fired by a co-felon in the furtherance of the attempted robbery or by another police officer in opposition to the attempted robbery"); *People v. Johnson*, 55 Ill. 2d 62, 69 (1973) (in affirming the defendant's conviction for murder where the defendant's companion returned to the tavern they had just robbed and killed the victim in order to avoid possible detection, the court reasoned: "Obviously, too, the plan for the crimes would include the use of the weapons if necessary to avoid apprehension and to effect an escape. Mrs. Pietras was shot in the presence of the other robbery victims and on the premises where the robberies took place. When Clay killed her the robbers had not 'won their way to a place of safety' "); *People v. Golson*, 32 Ill. 2d 398, 408-09 (1965) ("The postal inspectors were shot a short distance from the scene of the theft while the conspirators were attempting to escape from that scene. There is sufficient evidence from which the jury could infer that the conspirators intended to forcibly resist any attempt to arrest them, either during the course of the crime or in an attempt to escape from the scene. Such a plan comes within the doctrine of felony-murder, since it was contemplated that violence might be necessary to enable the conspirators to carry out their common purpose").

In the case at bar, Winters' death occurred as he effected his escape following the commission of the armed robbery. A killing that occurs during the course of an escape from a forcible felony is within the operation of the felony-murder rule. Consequently, defendant may be held liable for Winters' death.

Defendant's reliance on *Dennis*, 181 Ill. 2d 87, to the contrary is unavailing. In *Dennis*, the defendant testified that he and his fiancee drove to Earnest Jones' home. After picking up Jones, the three drove to a location in Chicago with the intent to purchase heroin. The defendant parked the car in an alley and allowed Jones to exit the car to effectuate the purchase. While the defendant and his fiancee were waiting, the defendant saw Jones being chased toward the car by an

unknown male. Jones jumped into the car, told the defendant to go, and the defendant sped off, believing there had been a "drug bust." When Jones reentered the defendant's car, Jones was carrying a small radio in his hand. Prior to this time, the defendant had not seen the radio and did not know from where Jones had gotten the radio. Jones subsequently told the defendant that he had taken the radio from the "guys" chasing him. The jury convicted the defendant of armed robbery on a theory of accountability. The appellate court reversed and remanded for a new trial because the trial judge told the jury to consider the period of time and the activities involved in escaping to a place of safety in determining whether the defendant was accountable for armed robbery.

In the State's subsequent appeal, the court began its analysis by considering the nature of accountability. Citing the Illinois accountability statute (720 ILCS 5/5–2(c) (West 1992)), the court held that a person is legally accountable for another's criminal conduct when either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid such other person in the planning or commission of the offense. The court noted that the defendant could only be accountable for the armed robbery if he aided or abetted Jones prior to or during the commission of the offense. *Dennis*, 181 Ill. 2d at 96. Next, the court considered the elements of armed robbery to determine the duration of the commission of the armed robbery. The court observed:

> "Neither flight from pursuing victims nor escape is included as an element in the statutory definition of robbery. See 720 ILCS 5/18–1(a) (West 1994). Thus, consistent with [*People v. Smith*, 78 Ill. 2d 298 (1980)], the offense of robbery is complete when force or threat of force causes the victim to part with possession or custody of property against his will. Although the force which occurs simultaneously with flight or an escape may be viewed as continuing the commission of the offense [citations], it is the force, not escape, which is the essence and constitutes an element of the offense. The commission of an armed robbery ends when force

and taking, the elements which constitute the offense, have ceased." *Dennis*, 181 Ill. 2d at 103.

Applying the law to the facts, the court noted that Jones was criminally liable and the offense of robbery was completed, for purposes of a guilt determination, at the moment in time when he forcefully took the radio. His conduct beyond the taking neither enhanced nor diminished his criminal culpability for armed robbery. *Dennis*, 181 Ill. 2d at 102-03. It was the defendant's uncontradicted testimony he was unaware of the armed robbery until Jones reentered his car. Further, the fact that the jury inquired as to when the armed robbery ended supported the conclusion that the jury did not find that the defendant was involved in planning the armed robbery either prior to picking up Jones or from the time that he entered the alley. The trial judge's instruction to the jury that it could consider the period of time involved in escaping to a place of safety was erroneous and was not harmless.

From the *Dennis* court's holding that escape is not an element of robbery, defendant seeks to draw a general rule that a killing committed during an escape following the commission of a robbery cannot be considered felony murder. Thus, defendant would have us abandon the felony-murder escape rule and overrule *Bongiorno* and its progeny. *Dennis* does not so require. We note the *Dennis* court cited with approval those authorities holding that, if a killing occurs in the course of an escape from a robbery, the escape is within the operation of the felony-murder rule. *Dennis*, 181 Ill. 2d at 104. Further, we note that *Dennis* involved an attempt by the State to hold the defendant liable for armed robbery *on an accountability basis*. As explained by the court in *Dennis*, felony murder and accountability have theoretically different underpinnings:

> "Felony murder seeks to deter persons from committing forcible felonies by holding them responsible for murder if a death results. [Citation.] Because of the extremely violent nature of felony murder, we seek the broadest bounds for the attachment of criminal liability. For that reason, in felony murder, a defendant's liability is not limited to his culpability for commission of the underlying

felony. A defendant may be found guilty of felony murder regardless of a lack either of intent to commit murder [citation], or even connivance with a codefendant [citation]. Our continued adherence to a proximate cause approach is further exemplary of how broadly we seek to extend the reaches of criminal liability in the case of felony murder. [Citation.]

Unlike felony murder, accountability focuses on the degree of culpability of the offender and seeks to deter persons from intentionally aiding or encouraging the commission of offenses. Holding a defendant who neither intends to participate in the commission of an offense nor has knowledge that an offense has been committed accountable does not serve the rule's deterrent effect. Further, the attachment of liability in such situations contravenes general concepts of criminal culpability. The felony-murder escape rule contemplates neither knowledge nor intent. Thus, the rule is irreconcilable with our accountability statute ***." *Dennis*, 181 Ill. 2d 105-06.

Consequently, we decline defendant's invitation to overrule established precedent and release him from liability for the killing that occurred during the course of the escape following the armed robbery.

Next, defendant argues we should abandon the proximate cause theory and adopt the agency theory for imposition of liability under the felony-murder rule. Defendant maintains that it is unfair, and a violation of due process, to hold a defendant liable for felony murder when the killing is at the hands of an innocent agent. Again, we decline defendant's invitation to overrule settled precedent.

In *People v. Lowery*, 178 Ill. 2d 462 (1997), the court reviewed at length the differences between the theories of liability upon which a felony-murder conviction may be based. The court explained that, under the proximate cause theory, liability attaches "for any death proximately resulting from the unlawful activity–notwithstanding the fact that the killing was by one resisting the crime." *Lowery*, 178 Ill. 2d at 465. Under the agency theory, " 'the doctrine of felony murder does not extend

to a killing, although growing out of the commission of the felony, if directly attributable to the act of one other than the defendant or those associated with him in the unlawful enterprise.' [Citations.] Thus, under the agency theory, the felony-murder rule is inapplicable where the killing is done by one resisting the felony." *Lowery*, 178 Ill. 2d at 466. The court compared Illinois case law adopting and implementing the proximate cause theory of liability with legal authorities from sister jurisdictions which follow the agency theory of liability. *Lowery*, 178 Ill. 2d at 465-66. The court also considered the intent of the legislature in drafting the felony-murder statute, finding that the legislature intended to adhere to the proximate cause theory of liability. *Lowery*, 178 Ill. 2d at 467-69. The court explained:

> "[W]e fail to recognize any language, express or implied, that would allow felony murder to be treated like all other offenses. It is the inherent dangerousness of forcible felonies that differentiates them from nonforcible felonies. [Citation.] As noted in the committee comments of the felony-murder statute, 'it is well established in Illinois to the extent of recognizing the forcible felony as so inherently dangerous that a homicide occurring in the course thereof, even though accidentally, should be held without further proof to be within the "strong probability" classification of murder.' 720 ILCS Ann. 5/9–1, Committee Comments–1961, at 15 (Smith-Hurd 1993). This differentiation reflects the legislature's concern for protecting the general populace and deterring criminals from acts of violence." *Lowery*, 178 Ill. 2d at 468-69.

Following this exhaustive review, the court concluded that it would be inappropriate to abandon the proximate cause theory of liability.

Citing the dissenting opinion of Justice Bilandic in *People v. Dekens*, 182 Ill. 2d 247, 254 (1998) (Bilandic, J., dissenting, joined by McMorrow, J.), defendant also suggests that it is unfair, and a violation of due process, to hold him liable for felony murder where the murder victim is a cofelon. Defendant argues, in essence, that he did not foresee or assume the risk

that his cofelon, Winters, would be killed during the criminal enterprise and, consequently, he should not be held liable for Winters' death. Once more, we decline defendant's invitation.

The precise issue raised by defendant, whether a defendant may be held liable for the death of a cofelon, was considered by the court in *Dekens*. As in *Lowery*, the court engaged in an extensive review of Illinois precedent supporting the use of the proximate cause theory of liability, and the legislature's intent in enacting the felony-murder statute. *Dekens*, 182 Ill. 2d at 249-54. The *Dekens* court concluded that "denying liability when the decedent is a cofelon would conflict with the legislature's adoption of the proximate cause theory" of liability for felony murder. *Dekens*, 182 Ill. 2d at 254.

We note that defendant does not raise any arguments other than those advanced in the dissenting opinion authored by Justice Bilandic. Indeed, defendant writes his "argument cannot be composed nor stated with any more clarity than it was stated *** by the late Justice Bilandic." This court had the benefit of the arguments and policy considerations raised by the dissenters in *Dekens*. The court determined not to adopt the position advanced by Justice Bilandic. In light of the thorough review of the proximate cause theory of liability contained in *Dekens*, the recency of the decision, and principles of *stare decisis* (see *People v. Robinson*, 187 Ill. 2d 461, 464 (1999); *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 349 (1995)), we determine also that the proximate cause theory of liability is the theory applicable to the case at bar.

The trial judge found defendant guilty of armed robbery and first degree murder based on the commission of a felony. We have reviewed the trial proceedings and find that Winters' death was a direct and foreseeable consequence of the armed robbery. See *Lowery*, 178 Ill. 2d at 470. Winters ordered Lieutenant Szparkowski to hand over his wallet, grabbed the wallet, and fled from the garage. Lieutenant Szparkowski gave chase and shot Winters as Winters turned, with the BB gun pointed toward the lieutenant. "Those who commit forcible felonies know they may encounter resistance, both to their affirmative actions and to any subsequent escape." *Hickman*,

59 Ill. 2d at 94. It is unimportant that defendant did not anticipate the precise sequence of events that followed the armed robbery. We conclude that defendant's unlawful acts precipitated those events, and he is responsible for the consequences. See *Lowery*, 178 Ill. 2d at 470.

## CONCLUSION

For the aforementioned reasons, we affirm the judgment of the appellate court.

*Appellate court judgment affirmed.*

JUSTICE McMORROW, dissenting:

In the case at bar, defendant argues that his conviction for first degree murder based on the commission of a felony (felony murder) cannot stand because it is premised on the death of a cofelon at the hands of an innocent agent. He advocates that we abandon the proximate cause theory in favor of the agency theory for imposition of liability under the felony-murder rule. The majority reaffirms this court's adherence to the proximate cause theory for imposing liability and affirms defendant's conviction relying on *People v. Dekens*, 182 Ill. 2d 247 (1998), wherein it was held that "denying liability when the decedent is a cofelon would conflict with the legislature's adoption of the proximate cause theory." Respectfully, I disagree. I joined Justice Bilandic's dissent in *Dekens* and continue to maintain that application of the proximate cause theory does not compel us to impose liability for murder under the felony-murder rule when the deceased is a cofelon. Moreover, I find the proximate cause theory particularly inapplicable under the facts of the present case.

In *Dekens*, Justice Bilandic presented cogent reasons for rejecting an interpretation of the felony-murder rule which would permit a defendant to be held liable for murder when the life that is taken in the course of a forcible felony is that of a coparticipant in the underlying felony. Justice Bilandic wrote:

"When a defendant's commission of a forcible felony proximately results in the death of an innocent party, I

˘16˘

agree that charging the defendant with murder may comport with notions of justice and fairness. There is, however, simply a qualitative difference between that situation and the situation presented here, where the death which resulted was that of a coparticipant in the underlying felony. As one renowned treatise on criminal law has noted:

'[I]t is now generally accepted that there is no felony murder liability when one of the felons is shot and killed by the victim, a police officer, or a bystander \*\*\*. \*\*\*

A more plausible explanation [for this conclusion] is the feeling that it is not justice (though it may be poetic justice) to hold the felon liable for murder on account of the death, which the felon did not intend, of a co-felon willingly participating in the risky venture. It is true that it is no defense to intentional homicide crimes that the victim voluntarily placed himself in danger of death at the hands of the defendant \*\*\*. But with unintended killings it would seem proper to take the victim's willing participation into account \*\*\*.' W. LaFave & A. Scott, 2 Substantive Criminal Law §7.5, at 217-18 (1986).

The majority provides no explanation for how the purpose of the felony-murder doctrine is served by applying it in cases such as this. Rather, the majority's holding is simply that the proximate cause theory 'compels' this result. \*\*\*. I disagree with this conclusion. Where a cofelon is killed by a third party, the most direct cause of the death is the *cofelon's* participation in the felony, not the defendant's acts. Contrary to the majority's characterization, this distinction does not go to the 'guilt or innocence' of the decedent. Rather, this distinction pertains to the 'proximate cause' of the death. Significantly, we are not here considering an issue of tort liability, but an issue of imposing criminal liability for first degree murder with the severe consequences that entails. In my view, the distinction between a third party killing an innocent party and a

˘17˘

third party killing a participant in the felony must be accorded weight. It is illogical to conclude that the same degree of guilt should attach where a defendant's felony results in the death of an innocent party and where it results in the death of an active participant in the felony." (Emphasis in original.) *Dekens*, 182 Ill. 2d at 256-57 (Bilandic, J., dissenting, joined by McMorrow, J.).

Here, again, the majority fails to explain why the purpose of the felony-murder doctrine is served by applying it in cases such as this. Moreover, the majority fails to properly analyze and apply the proximate cause theory, particularly under the facts of the present case.

In the case at bar, defendant drove his friend Winters into Chicago, knowing that Winters intended to commit an armed robbery there. When they arrived in Chicago, Winters exited defendant's car to look for a suitable robbery victim. Defendant waited in the car for Winters to return so that defendant could provide Winters with transportation out of the city. Winters never returned to defendant's car, however, because after Winters committed an armed robbery, Winters was shot and killed by the victim, who happened to be an off-duty police officer.

As recognized in *Dekens*, "the focus of the proximate cause theory is on the chain of events set in motion by the defendant." *Dekens*, 182 Ill. 2d at 254. In the case at bar, defendant's participation in the armed robbery was limited to providing transportation to Winters. While defendant's involvement is sufficient to hold him accountable for the armed robbery, it is too attenuated to support a finding that his conduct set in motion the chain of events leading to Winters' death. Here, even more so than in *Dekens*, the most direct cause of the cofelon's death is the *cofelon's* participation in the felony and not any conduct of the defendant.

For all of the above-stated reasons, I believe that defendant's conviction for first degree murder is not consonant with notions of justice and fairness and should be reversed. Accordingly, I dissent.