# Illinois Official Reports

## Appellate Court

---

### *People v. Davis*, 2019 IL App (1st) 160408

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PARRISH DAVIS, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-16-0408 |
| Filed<br>Modified upon<br>denial of rehearing | September 23, 2019<br><br>October 28, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-10327(03); the Hon. Lawrence E. Flood, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Heidi Linn Lambros, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Pucinski and Coghlan concurred in the judgment and opinion. |

¶ 1    The State charged Parrish Davis with possessing more than 900 grams of cocaine found in a compartment secreted near where he sat in the backseat of a car. Before trial, Davis moved to suppress this evidence, arguing that the search leading to its discovery was unreasonable. The trial court denied the motion. In addition to the cocaine, officers found three guns and multiple rounds of ammunition. The State moved *in limine* to admit the gun evidence along with an admission to police that he possessed the drugs and guns. The trial court granted both *in limine* motions. A jury convicted Davis of one count of possession with intent to deliver more than 900 grams of cocaine. The trial court sentenced Davis to 25 years in prison.

¶ 2    On appeal, Davis raises four arguments: (i) the trial court erred in denying his motion to suppress evidence, (ii) the trial court erred in admitting evidence of the guns, (iii) the State violated the trial court's *in limine* ruling by introducing evidence of the statement not covered by that ruling, and (iv) his sentence is excessive. At oral argument, Davis withdrew his third contention. We disagree with Davis's remaining arguments and affirm his conviction and sentence.

¶ 3                                    Background

¶ 4    At about 3 p.m. on October 24, 2011, Yakov Witherspoon picked up a woman he knew, Franchon Jenkins, so she could get her paycheck at Navy Pier. He drove a silver two-door Honda. Parrish Davis accompanied them, sitting in the backseat. When they arrived at Navy Pier, Witherspoon let Jenkins out and then dropped Davis off at the Louis Vuitton store on Michigan Avenue. Witherspoon went back to Navy Pier, picked up Jenkins, and returned to the Louis Vuitton store for Davis. As they drove back to Jenkins's home, Jenkins lay back and closed her eyes. She woke up when Witherspoon parked the Honda in a Marshall's lot.

¶ 5    Witherspoon backed into the parking space. Davis opened his door, and a man in the driver's seat of a van next to them handed a white bag into the backseat. Witherspoon could not see what was in the bag and had no knowledge about what was in it. Jenkins also saw "a white bag being hand[ed] towards the back." After the other man passed the bag into the car, Witherspoon "pulled off."

¶ 6    While the three went about their day, Chicago police officers were deep into a narcotics investigation, working as part of a task force with the federal Drug Enforcement Administration (DEA). Undercover Chicago police officer Edison Cevallos phoned a man named Jorge Urbina—the target of the investigation—at about 2:40 p.m. Cevallos ordered 2.5 ounces of cocaine from Urbina, an order similar to five or six others he had made. Cevallos arranged with Urbina to buy the cocaine around 5 p.m. that day. He relayed the information about the planned drug buy to the other members of his team.

¶ 7    Chicago police officer Robert Dembski, also part of the DEA task force, was already familiar with Urbina. At 4:11 p.m., Dembski saw Urbina driving a maroon minivan near 59th Street and Richmond Street. He followed, keeping Urbina under constant surveillance until he pulled into a parking spot near a Marshall's in an "outdoor shopping center" at 4:47 p.m. When they arrived at the parking lot, no other cars were near Urbina's van. Other surveillance officers arrived, and Dembski passed off primary surveillance responsibilities to Chicago police officer Kenneth Mok.

¶ 8     About 30 minutes later, Mok watched as "a silver-colored, two-door Honda arrive[d] at the location and backed into the space next to the minivan." The Honda and the minivan parked so that the driver's sides faced each other. Mok saw the driver door of the Honda and the minivan open at the same time and saw Urbina "lean outward *** down a little bit and [saw] a white object being transferred from the minivan to the Honda." From Mok's vantage point, the object looked like the "corner of a white bag, possibly." The drivers closed their doors, and the Honda and the van "swiftly left the location." Mok believed he had seen a drug transaction.

¶ 9     The van and the Honda travelled in separate directions. Mok instructed his team to follow the Honda, which drove to the Dan Ryan Expressway and got off at 59th Street. From there, Mok watched as Witherspoon "did not use his turn signal to make a southbound turn onto Prairie." Witherspoon, on the other hand, recalled using his turn signal for every turn. Witherspoon pulled over near 60th Street and Prairie Avenue to let Jenkins out. Mok "asked all [his] teammates to converge," and Witherspoon and Jenkins recalled that "the police cars just pulled up behind [them]" without activated lights or sirens.

¶ 10    Mok asked Witherspoon for his driver's license, which he gave. Mok asked all three occupants if they owned the car, and they all said they did not. After learning that, Mok had other officers take Jenkins and Davis out of the car. Witherspoon is paralyzed from the waist down; Mok allowed him to stay in the car.

¶ 11    Mok asked Witherspoon if any drugs were in the car. Witherspoon said, "There's no drugs in the car, go ahead and search it, it's not mine." At this point, Mok helped Witherspoon out. Mok then started to search the car. Witherspoon denied being asked about drugs and denied giving consent to search, saying that officers "[p]retty much just start[ed] tearing the car up" from front to back right when they got to the car.

¶ 12    Mok started his search "from the front passenger side and worked [his] way towards the back compartment." He did not find any drugs or contraband in the front area. He overheard a sergeant talking to Witherspoon, "trying to convince Mr. Witherspoon to tell [them] where the drug location was." At that point, Mok said that Witherspoon made either a "gesture" or an "eye movement" to "make some sort of indication to [Mok] that, without being too specific, that there [was], you know, the contraband in the back seat [sic]." According to Mok, Witherspoon was "nodding his head towards the side of the—the rear side of the vehicle with eye movement as well as, you know, whispering that it's over there."

¶ 13    Inspired by his communication with Witherspoon, Mok shifted his search to "the rear behind the driver's side." Mok noticed "a vinyl panel about the armrest," which he "pried open with [his] hand." Once he opened the panel, Mok could see that "there's a hidden compartment, you know, inside that location." Mok reached in and took out a white bag with an object "wrapped in black electrical tape." Mok believed the object was a kilogram of cocaine. The compartment also had three semiautomatic guns and an electronic scale. Then Mok opened another panel on the rear passenger side. He found another compartment with a green bag containing 9-millimeter and .45-caliber rounds of ammunition.

¶ 14    Before trial, Davis filed a motion to suppress all the evidence found in the Honda. He argued that there was no basis for the stop, that it was illegal, and that any consent Witherspoon gave was tainted by the stop's illegality. Davis's counsel also argued that, even if it was not an illegal stop, the search exceeded the scope of the stop's purpose. The trial court pressed the State on the consent issue, and the State argued (among other points) "that this was a consent, a valid consent stop, and the stop itself is supported by the observations and experience of the

officer." The trial court denied the motion, finding that the officers conducted a valid *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1 (1968)) based on their observations of the interaction between Witherspoon and Urbina. As to consent, the trial court denied the motion, finding, "I believe the police officer. I believe that Mr. Witherspoon gave consent to the officer to search the vehicle. The officer searched the vehicle and recovered the contraband."

¶ 15    Also before trial, the State moved "[t]o allow the People to introduce the three handguns that were recovered at the same time as the kilogram of cocaine." The State sought admission of the gun evidence on the ground that it was relevant to prove Davis's intent to deliver the drugs. The State also contended that the evidence was not cumulative of Davis's statement because Davis would deny making the statement and the gun evidence helped prove up the statement, which also contained an admission about the guns. Defense counsel argued that the gun evidence would be "overkill" as the statement was already coming in.

¶ 16    The trial court partially denied the State's motion to admit the gun evidence:

> "I'm going to deny the motion *in limine* on behalf of the State because in light of my ruling as far as the statement and the purpose for which that's being admitted, knowledge, lack of mistake and intent, I think that in looking at the probative value versus the undue prejudice, I think by allowing that information in regarding the guns under 403, number one, it may be cumulative, number one; and number two, I think in light of my ruling on the statement, it would be unduly prejudicial."

The State sought clarification on the scope of the ruling and this exchange took place:

> "THE COURT: Right, but I'm not going to let you argue the inference that's to be drawn from those weapons as far as knowledge, intent, or lack of mistake. Do you understand?
>
> ASSISTANT STATE'S ATTORNEY [(ASA)]: So the recovery comes in.
>
> THE COURT: Yes. That's what the officers recovered.
>
> [ASA]: And then I just stay away from the argument.
>
> THE COURT: Absolutely.
>
> [ASA]: Certainly.
>
> THE COURT: Okay? Don't argue that to the jury about the recovery of the guns.
>
> [ASA]: I won't but the fact that it comes in will come out of the officer.
>
> THE COURT: Right."

In sum, the trial court allowed the State to admit evidence that officers recovered guns but admonished the State to refrain from arguing to the jury any inferences based on the recovery of the guns.

¶ 17    At Davis's jury trial, Dembski and Mok gave testimony substantially similar to their suppression hearing testimony. Mok described the recovery of the cocaine and guns from the hidden compartments. Through Mok's testimony, the State introduced the three guns as exhibits, and Mok described their make and caliber and explained that they were loaded when he recovered them. Mok also described the ammunition and magazines recovered from the hidden compartments. In addition, Chicago police officer Guillermo Gamboa testified about the inventory procedures used for the recovered handguns, detailing his procedure, and again describing them by make and caliber. After the testimony concluded, the court admitted all of the State's exhibits, including the guns and the statement, without objection.

- 4 -

¶ 18    The jury found Davis guilty of one count of possession of a controlled substance with intent to deliver. Davis filed a motion for a new trial, arguing, among other reasons, that the trial court should have granted his motion to suppress evidence. The motion also challenged the trial court's ruling on the admission of Davis's statement but did not argue that the admission of the gun evidence was improper. The trial court denied the motion.

¶ 19    Before sentencing, the probation department prepared a presentence investigation report (PSI). The PSI noted that Davis did not have a record of criminal convictions, either as an adult or as a juvenile. Davis graduated from high school and, until the time of his arrest, was employed. He has three children. Davis reported that he has heard voices in his head since he was five years old but never has been prescribed psychotropic medication. He, however, took prescribed medication for diagnosed depression. In addition to prescribed medication, Davis self-medicated by abusing alcohol, consuming about a fifth of liquor daily. He denied using any illegal drugs.

¶ 20    At sentencing, the State agreed that Davis would be at the lower end of the sentencing range if he had possessed less cocaine. But, the State focused on the amount, 989.2 grams, and the presence of guns and ammunition, which constituted aggravation in its view. The State asked for a sentence "with an eye towards the idea that the minimum sentence would not be appropriate." Defense counsel asked for the minimum sentence, emphasizing Davis's lack of criminal background, steady work history, and untreated mental health issues.

¶ 21    The trial court sentenced Davis to 25 years, finding:

> "Let [the] record reflect that the court has reviewed the presentence investigation and also considered the matters in aggravation and mitigation involving this case. I have heard the arguments of counsels and I have given the defendant the right of allocution in this case.
>
> This is a case which is a Class X felony but there is an enhanced sentence based on the amount of drugs recovered. The range is from 15 to 60 years at 75 percent.
>
> The court is required to take into consideration many factors in the case and not only the amount of drugs and the circumstances under which the drugs were recovered but also the information that I received in the presentence investigation regarding your background.
>
> In this case, this is a non-probationable case. The court requires that I look at the issue of probation but in this case, that's taken off the table because of the nature of the charge against you and the finding by the jury in that regard.
>
> The range of sentence in this case is from 15 to 60 years at 75 percent. Considering the fact that you have no prior background and considering the facts in the case, I think the appropriate sentence is a lesser sentence in the range, therefore, I am going to sentence you to 25 years."

Davis filed a motion to reconsider his sentence, arguing that it was "excessive and unwarranted," which the trial court denied.

¶ 22                                         Analysis

¶ 23    Davis makes three arguments challenging the judgment. In support of outright reversal, he argues that the trial court erred in denying his motion to suppress evidence because officer Mok's search went beyond the scope of the driver's consent. In support of a new trial, he argues

that the trial court erred in granting the State's motion *in limine* to admit evidence about the guns found in the car. Finally, challenging his sentence, he argues that 25 years is excessive given the nature of his conduct or that, at minimum, we should remand for resentencing, as the trial court failed to adequately justify the sentence.

¶ 24                                  *The Search of the Car*

¶ 25     Although Witherspoon disputed it, in this court, Davis does not dispute Witherspoon's consent to the search. Instead, Davis contends that Mok exceeded the scope of the consent by "physically" tearing apart the car's interior, an action Witherspoon would not have reasonably understood his consent to include. The State disagrees on two grounds. According to the State, we are not presented with the issue of Witherspoon's consent because the officers had probable cause to search the Honda, bringing the search within the automobile exception to the fourth amendment's warrant requirement. Responding to the argument Davis made, the State asserts that Witherspoon's nonverbal communications to Mok extended the scope of his consent to "the hidden compartments." In reply, Davis says the officer did not have probable cause; the police "could not identify the item passed between Davis and Urbina," and so the automobile exception does not apply.

¶ 26     We review the trial court's ruling on Davis's motion to suppress, applying a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). We will not reverse the trial court's factual determinations unless they are against the manifest weight of the evidence, but we review the trial court's legal conclusions *de novo. Id.*

¶ 27     As a preliminary matter, Davis argues that the State cannot raise its argument based on the automobile exception, having not argued that theory in the trial court. We disagree. In criminal cases, principles of forfeiture apply to the State as much as they apply to defendants. *People v. Holloway*, 86 Ill. 2d 78, 91 (1981). But, the forfeiture rule is one of fairness, based on the premise that the trial court should get the first opportunity to examine an issue and that a party should not be able to win reversal of a judgment "through [its] own inaction." *People v. Denson*, 2014 IL 116231, ¶ 13. Those principles do not apply to the prevailing party, who can generally "defend its judgment on any basis appearing in the record." *Id.* ¶ 17. That said, even a prevailing party cannot "advance a theory or argument on appeal that is *inconsistent* with the position taken" in the trial court. (Emphasis added.) *Id.*

¶ 28     We agree with Davis that the arguments in the trial court heavily focused on the validity and scope of Witherspoon's consent. Throughout the State's argument, however, it repeatedly asserted that the officers had sufficient cause to stop Witherspoon and engage with the passengers more generally. The State argued, "the officers had plenty of observations here to support approaching the vehicle and speaking to the driver." The State described, as "background" information, the surveillance done on Urbina and its purpose "to find out where he gets his drugs possibly, if he sells to other people, other customers. It's surveillance. They have a known target and they're following him. That leads them to these individuals." The State's final submission was "that this was a consent, a valid consent stop, and the stop itself is supported by the observations and experience of the officer."

¶ 29     In context, the State's argument, while focused on consent, includes repeated references to its belief that the officers had sufficient cause to stop the Honda. The State's position on appeal, that the officers had probable cause to search the car independent of consent, follows from (or at least is not inconsistent with) its arguments before the trial court. As the appellee, the State

can rely on the automobile exception in support of its contention that we should affirm the trial court's judgment.

¶ 30     Considering both arguments, we agree that the officers exceeded the scope of Witherspoon's consent but find that, by the time the officers exhausted the limits of Witherspoon's consent, they had sufficient cause to continue searching under the automobile exception. We affirm the denial of Davis's motion to suppress.

¶ 31                                    *Consent to Search*

¶ 32     The fourth amendment protects people from unreasonable searches by government officers. U.S. Const., amend. IV. The United States Supreme Court has "long approved consensual searches" as inherently reasonable. *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991). As a result, a search done with consent "is not subject to the fourth amendment's warrant and probable cause requirements." *People v. Holliday*, 318 Ill. App. 3d 106, 112 (2001). But consent does not necessarily give the officer unbridled discretion. *Id.* ("[an officer] has no more authority than the defendant apparently gave through the consent"). The scope of a consent search must consider "what a reasonable person would have understood from the exchange between the defendant and the officer." *Id.* We apply an objective reasonableness standard; irrelevant are the subjective beliefs of both the consenting party and the searching officer. *People v. Baltazar*, 295 Ill. App. 3d 146, 149-50 (1998).

¶ 33     As to the reasonableness of consent searches, the United States Supreme Court has explained that the search's "express object" generally defines its scope. *Jimeno*, 500 U.S. at 251. In *Jimeno*, the defendant gave the officer permission to search his car and knew that the officer was looking for drugs. *Id.* During the search, the officer found a paper bag on the floor. *Id.* Given that combination of facts, the court concluded that "[a] reasonable person may be expected to know that narcotics are generally in some form of container," which extended the search "beyond the surfaces of the car's interior to the paper bag lying on the car's floor." *Id.* So even though an officer may develop probable cause to believe that there are trap compartments during a consent search, entry into those compartments goes beyond the scope of the consent unless a reasonable person would view the interaction between the officer and consent-giver as encompassing those specific areas.

¶ 34     We view the objective facts supporting a search or seizure from the officer's perspective. See *People v. Booker*, 2015 IL App (1st) 131872, ¶ 41 (Facts known at the time of the police action " 'should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her.' " (quoting *People v. Thomas*, 198 Ill. 2d 103, 110 (2001))). The State argues the record shows "that [Witherspoon] affirmatively indicated to the officer the compartment's location." We do not see sufficient evidence in the record supporting an objective belief that Witherspoon's head nod referred to the secret compartments. At the time of the search leading to the discovery of the secret compartments, Mok knew that Urbina passed a white object into the Honda. He knew that every occupant of the Honda had denied owning the car. He knew that he found nothing in the front area and that Witherspoon had indicated the package was "over there," motioning toward the back. On these facts, it was objectively reasonable for Mok to believe that he had permission to search the back passenger compartment—Witherspoon's initial consent to search coupled with the head movement and eye gestures got him that far. But Mok had no objective information leading him to reasonably

- 7 -

believe that Witherspoon even knew there were trap compartments, let alone that he had given permission to remove interior panels.

¶ 35 We find instructive *Holliday*, 318 Ill. App. 3d 106, which Davis cites. In *Holliday*, officers on patrol saw the defendant in an alley engaging in what they thought was a drug transaction. *Id.* at 108. The officers went up to the defendant and asked for permission to search his person, which he granted. *Id.* During the search, one of the officers "performed a 'crotch check' " and felt what he thought to be crack cocaine around the genital area based on "his experience with drug dealers who had concealed cocaine" there. *Id.* The court found that the search exceeded the scope of the defendant's consent. *Id.* at 113. The court reasoned that the officer, in requesting consent, had not "singled out any particular area of the defendant's body." *Id.* Because the officer had failed to particularize the request, "a reasonable person would have expected no more than a general frisk or pat-down" and "would be surprised to find an officer's hand grabbing his crotch." *Id.*

¶ 36 Even though the court in *Holliday* focused on the "heightened privacy" we have in our bodies (*id.* at 112), much of the reasoning applies to the search here. Officer Mok did not single out any area of the car for inspection and received only general consent to "go ahead and search." Without giving Witherspoon more information, it would be unreasonable to expect his consent to go beyond "a general frisk or pat-down" of the interior compartment. As we have already explained, Witherspoon's head movements and whisper that "it's over there" only directed Mok to the backseat area where he had only just begun to search. Mok's testimony reveals that Witherspoon was "trying to make some sort of indication to [him] that, *without being too specific*, that there is, you know, the contraband in the back seat [*sic*] of the vehicle." Even if we were evaluating Mok's subjective belief, his testimony shows that he understood Witherspoon's head movement to be a nonspecific indication to check the backseat. Without seeking more specific consent, Mok did not have an objectively reasonable belief that Witherspoon permitted the search to extend to the hidden compartments.

¶ 37 *The Automobile Exception*

¶ 38 Though Witherspoon's actions did not provide Mok with sufficient consent to search the trap compartments, Witherspoon's actions did provide Mok with a crucial piece of evidence establishing probable cause. Ordinarily, if officers believe they have probable cause to search, the fourth amendment requires them to get a warrant. *People v. Contreras*, 2014 IL App (1st) 131889, ¶ 27. The United States Supreme Court has carved out an "automobile exception" to the warrant requirement, allowing officers to "search a vehicle without a warrant where probable cause exists to believe the automobile contains evidence of criminal activity subject to seizure." *Id.* ¶ 28 (citing *People v. James*, 163 Ill. 2d 302, 312 (1994)); see also *California v. Acevedo*, 500 U.S. 565, 569 (1991). The exception draws on the idea that automobiles are mobile and a driver can "render[ ] it impossible *** to obtain warrants for their search" by absconding with the vehicle and its contents. *Contreras*, 2014 IL App (1st) 131889, ¶ 28. Under the automobile exception, the search area "includes any interior compartment of the vehicle that might reasonably contain the contraband." *Id.*

¶ 39 The State, relying primarily on *Contreras*, argues that the officers had probable cause to believe narcotics secreted in the Honda, particularly given their background knowledge learned from investigating Urbina. The State emphasizes that officers saw a white package enter the car without ever seeing anyone remove it. Davis, relying on *People v. Trisby*, 2013 IL App

(1st) 112552, argues that the observation of a single interaction of an unknown object does not amount to probable cause to believe that a drug deal has taken place. Our review of these cases reveals that the facts known to the officers, leading to the search of Davis's car, fall somewhere in between *Contreras* and *Trisby*.

¶ 40    Because *Contreras* contains a lengthy factual recitation, we only include the facts relevant to our discussion. Local police officers working with the DEA arrested a man named Kasp, who became an informant. *Contreras*, 2014 IL App (1st) 131889, ¶¶ 4, 6. Kasp identified Contreras as his heroin supplier. *Id.* ¶ 6. Contreras and a codefendant (known only as Pedro) arrived at Kasp's house in Pedro's car, and Kasp saw Pedro take out a brown paper bag from a hidden compartment in the back of the car. *Id.* The three then went into Kasp's house where Contreras gave the bag, which contained heroin, to Kasp. *Id.* Officers followed Pedro's car once it left Kasp's house. One of the officers saw Contreras (who was driving) holding a brown paper bag; Contreras then "turned his body right reaching into the backseat area" and turned back around without the bag in his hand. *Id.* ¶ 13. Another officer had already indicated that a suspected "trap or secret compartment" was in the backseat. *Id.* The officers pulled the car over after noticing that neither Contreras nor Pedro wore a seatbelt. *Id.* ¶ 15.

¶ 41    The officers looking in the car did not see a brown paper bag nor had they seen a brown paper bag thrown or dropped from the car. *Id.* ¶¶ 14-15. The officers did a brief search and noticed nothing in the backseat resembling the brown paper bag. *Id.* ¶ 17. They relocated the car to a police station and conducted a dog sniff, which was positive for narcotics. *Id.* ¶¶ 19, 21. They opened a "car trap" in the backseat containing heroin, cocaine, four guns, and cash. *Id.* The court concluded that this combination of facts amounted to probable cause to search the car. *Id.* ¶ 35.

¶ 42    By relying on *Contreras*, the State inflates the information available to the officers. Unlike *Contreras*, the officers that searched the Honda did not have an informant to tell them about the narcotics activities of the targets of the search. Mok and his companions knew nothing about Witherspoon, Jenkins, or Davis. More importantly, the officers had no knowledge about the Honda and could not have known it had trap compartments. Also, unlike *Contreras*, the officers made no direct observations of anything about the car itself or the actions of the people inside to indicate the presence of hidden compartments. Mok could not see the package being handed into the backseat; no testimony indicates that the officers saw anyone in the Honda make any movements.

¶ 43    Just as the State inflates its case, Davis's reliance on *Trisby* understates the information available to the officers. In *Trisby*, officers on patrol saw a woman walk up to a car and hand some money to the rear passenger. *Trisby*, 2013 IL App (1st) 112552, ¶ 4. That passenger then handed "a small unknown object" to the woman. *Id.* The officers followed the car and pulled it over for failing to use a turn signal. *Id.* ¶ 5. An officer walked up and saw the backseat passenger (the defendant) with a $10 bill in his hand. *Id.* The officer had the defendant get out of the car and reached directly into defendant's front pocket, finding nine clear plastic baggies containing heroin. *Id.* ¶¶ 5-6. The court held that "probable cause is not established by a single hand-to-hand transaction involving an unidentified object together with a few furtive hand movements towards a pants pocket." *Id.* ¶ 17.

¶ 44    We agree with Davis's argument that Mok was only able to observe one transaction between Urbina and the occupants of Witherspoon's car. We also agree that Mok was unable to identify the object with any specificity. But, there our agreement ends. The officers in *Trisby*

- 9 -

were on routine patrol, not part of any ongoing investigation and not experts in narcotics. See *id.* ¶ 4. The context of Mok's observations represents a distinct addition to the factual landscape absent in *Trisby.*

¶ 45 The officers' testimony shows involvement in a long-running investigation with Urbina as its target. Cevallos had engaged in at least five or six transactions with Urbina; Mok was close enough to see that the white package came from Urbina and went to the Honda's occupants. Given what the officers knew at this point, at least a possibility existed that Mok had seen a drug transaction. The orientation of the vehicles during the transaction added to the suspicion—Urbina pulled into his parking space and Witherspoon backed into his. While innocent actions on their own, so parked, the entire transaction appeared designed to intentionally conceal—when Urbina opened his door, he would block the view of the space between the cars from one direction; when Witherspoon opened his door, he would block the view of the space between the cars from the other.

¶ 46 Once the officers pulled around the Honda, more facts added to the suspicion. During Mok's initial search, consented to by Witherspoon, he did not find anything resembling the white package. At oral argument, Davis's counsel noted the possibility that Jenkins could have discarded the white package because she was already out of the car when officers arrived. But, Jenkins's location when the officers arrived was a disputed fact. Jenkins testified that she was already walking toward her house; Mok testified that he had to remove Jenkins from the Honda before searching it. The trial court expressly resolved the credibility question in favor of the officers.

¶ 47 In his petition for rehearing, Davis argues that the trial court's factual findings suggest the court believed Jenkins was out of the car when the officers arrived. We acknowledge that the trial court's recitation indicates "the woman who was in the vehicle was alighting from the vehicle." While the court was summarizing the testimony it referred to "the female who by this time was out of the vehicle and almost across the street." That was Witherspoon's and Jenkins's testimony; but, as we noted, the trial court did not find either of them credible. Regardless, whether Jenkins was seated in the Honda, "alighting from the vehicle," or "almost across the street," nothing in anyone's testimony reveals she was seen acting in a way connoting she possessed or discarded the white object. Additionally, officers detained her and searched her. They did not find anything. Probable cause does not require an officer's belief that a person has committed a crime or, by extension, that contraband is located in a particular place to be more likely true than false. *E.g.*, *People v. Wear*, 229 Ill. 2d 545, 564 (2008). That Jenkins may have been outside the car does not render unreasonable the officer's belief that the white object was still inside.

¶ 48 The final significant difference between this case and *Trisby* involves Witherspoon indicating that Mok search in the backseat. While Witherspoon's actions did not extend his consent, as we have discussed, his actions did indicate to Mok that the white package must be hidden somewhere despite his initial search. Mok testified that he was an experienced narcotics officer, familiar "with locations in which individuals could secrete or hide narcotics," having found drugs in secret compartments "numerous times." That experience, together with the facts we have described, amount to probable cause to search.

¶ 49 We conclude that Mok's actions exceeded the scope of Witherspoon's consent to search, but by the time Mok exceeded Witherspoon's consent, he had sufficient facts to amount to

probable cause. Once Mok had probable cause, the search fell within the automobile exception and was permissible without a warrant.

¶ 50    We affirm the trial court's denial of Davis's motion to suppress.

¶ 51                                *Motion to Allow Gun Evidence*

¶ 52    Davis claims that the trial court's ruling on the State's motion to allow the gun evidence was error. The State argues this issue has been forfeited because Davis did not raise it as an alleged error in his motion for a new trial. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("Both a trial objection and a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases omitted.)). Davis raised two errors concerning the trial court's rulings on motions *in limine*, neither related to the introduction of the gun evidence. Under *Enoch*, the issue is forfeited.

¶ 53    Davis maintains he sufficiently preserved the issue because "the improper admission of extraneous other-crimes evidence violated Davis'[s] due process right to a fair trial," a condition, he says, that eliminates the need for a posttrial motion. This exception to the forfeiture rule, known as the constitutional issue exception, allows appellate courts to review constitutional claims that were not properly preserved at trial but that could be raised later in a postconviction petition. *People v. Cregan*, 2014 IL 113600, ¶ 18. The exception advances judicial economy, preventing extended litigation when the record contains enough to consider the issue on direct appeal. *Id.* Davis, however, reads the constitutional issue exception too broadly.

¶ 54    Of course, in a broad sense, every defendant has a constitutional right to a fair trial protected by the due process clauses of both the United States and Illinois Constitutions. *People v. Blue*, 189 Ill. 2d 99, 138 (2000) (citing U.S. Const., amend. XIV, § 1, and Ill. Const. 1970, art. I, § 2). Nevertheless, not every error that could potentially deprive a defendant of that right establishes constitutional error. Our supreme court regularly distinguishes between evidentiary errors and constitutional errors. See, *e.g.*, *In re E.H.*, 224 Ill. 2d 172, 180-81 (2006) (outlining distinction between harmless error tests for evidentiary errors versus constitutional errors). Indeed, in *Blue*, our supreme court equated the question of whether cumulative errors deprived a defendant of a constitutional right to a fair trial with the analysis we undertake under the second prong of plain error. *Blue*, 189 Ill. 2d at 138. Determining whether a defendant has been denied his or her right to a fair trial, while part of our "corrective action," does not constitute its own standard for classifying a particular error. *Id.* Davis has not cited, and we have not found, a case suggesting that the question of the admissibility of evidence subsumes constitutional magnitude.

¶ 55    We conclude that the constitutional issue exception to forfeiture does not apply, so Davis has forfeited his claim. That said, Davis argues that we can review the trial court's ruling on the State's motion *in limine* for second prong plain error. See, *e.g.*, *People v. Thompson*, 238 Ill. 2d 598, 614 (2010) (second prong plain error implicated where alleged error "affect[s] [defendant's] right to a fair trial and challenge[s] the integrity of the judicial process"). Alternatively, Davis argues that counsel was ineffective for failing to preserve the issue. Under either alternative, we first consider whether error occurred. *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47 ("the failure of a defendant to show that error occurred at all defeats both an ineffective assistance claim and a claim of error under either prong of the plain error doctrine").

¶ 56    Turning to the merits, we will affirm the trial court's admission of other-crimes evidence unless the trial court abused its discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). To demonstrate an abuse of discretion, the trial court's decision must be "arbitrary, fanciful, or unreasonable." (Internal quotation marks omitted.) *Id.*

¶ 57    Evidence of other crimes is inadmissible if its only purpose seeks to establish the defendant's propensity to commit crimes. *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991). But that evidence is admissible when "relevant to prove *modus operandi*, intent, identity, motive, or absence of mistake." *Id.* In the trial court, the State moved to introduce evidence of the guns recovered from the Honda on the ground that "the combination of the guns and the drugs *** demonstrate[s] Defendant's intent in this case (coupled of course with the evidence that both were discovered in a secret compartment)." The trial court admitted evidence of "what the officers recovered," but told the State not to "argue that to the jury about the recovery of the guns." Davis argues that his intent had never been at issue, rendering the admission of the gun evidence as cumulative and prejudicial.

¶ 58    In support of this argument, Davis cites *People v. Knight*, 309 Ill. App. 3d 224, 227 (1999), holding that when "[t]he defendant's state of mind was not in controversy," evidence of other crimes to be inadmissible to prove intent. The State counters with *People v. Cavazos*, 2015 IL App (2d) 120444, where the court rejected a similar argument because "regardless of [the] defense, the State had to prove [the defendant]'s intent beyond a reasonable doubt." *Id.* ¶ 71 (relying on *People v. Heard*, 187 Ill. 2d 36, 59-60 (1999)). Only a few months later, this district interpreted *Heard* to the contrary and followed *Knight*. *People v. Clark*, 2015 IL App (1st) 131678, ¶¶ 33-38. In *Clark*, the court held that the use of "intent" in *Heard* was not in the "strict legal sense," but instead encompassed the defendant's "overall state of mind" (*id.* ¶ 38), and concluded that other-crimes evidence cannot be used to prove intent where intent is not at issue. *Id.* ¶ 47.

¶ 59    We confront a split in authority about the admissibility of other-crimes evidence to help prove intent where intent is not expressly put at issue. Actually, the split extends beyond the districts of our appellate court. See *Hubbard v. State*, 422 P.3d 1260, 1264-65 (Nev. 2018) (mentioning *Clark* and describing competing approaches in federal circuit courts of appeals). Davis's case does not require us to stake our own position because his theory at trial did not make intent an expressly disputed issue; his primary argument characterized the police investigation as faulty and any evidence of his involvement should not have been trusted.

¶ 60    We start with the Illinois Supreme Court's decision in *Heard*. There, the defendant murdered his ex-girlfriend and her current boyfriend. *Heard*, 187 Ill. 2d at 46-47. During trial, the State introduced evidence of three incidents where the defendant had been violent toward both of them. *Id.* at 57-58. The court held that the trial court did not abuse its discretion in admitting that evidence, as it was "evidence of defendant's *** motive and intent to harm [the victims]." *Id.* at 58-59. The defendant argued, as Davis does, that "motive and intent were not at issue." *Id.* at 59. The court rejected that argument saying, "Although the evidence readily demonstrated that the shooter intended to kill the victims, the prosecution had to prove that defendant was the shooter. The prosecution introduced the other-crimes evidence to prove *defendant's* motive and intent to kill the victims ***." (Emphasis in original.) *Id.* at 60.

¶ 61    As we have said, this court interpreted *Heard*'s use of "motive and intent" to refer broadly to the defendant's "overall state of mind" as opposed to whether the defendant intended to cause death or great bodily harm to the victims in a legal sense. *Clark*, 2015 IL App (1st)

- 12 -

131678, ¶ 38. We disagree with the distinction suggested by *Clark*, as the defendant's state of mind—whether we call it motive or intent—also was not at issue in *Heard* for two reasons. First, the defendant's theory of the case was not that Heard lacked a motive for harming his ex-girlfriend; his entire defense depended on an alleged alibi. *Heard*, 187 Ill. 2d at 50-51 (describing alibi witness testimony). So, to the extent that the *Heard* court zeroed in on motive or general mental state as opposed to legal intent, its holding would be the same: other-crimes evidence relevant to prove mental state is admissible even where that mental state is not at issue.

¶ 62    Second, though motive can provide important context for a defendant's actions, it is not itself an element of a criminal offense. See *People v. Easley*, 148 Ill. 2d 281, 325-26 (1992) (citing *People v. Smith*, 141 Ill. 2d 40, 56 (1990)). This is important. The court in *Heard* focused on "the prosecution *[having] to prove* that defendant was the shooter" even though no real evidentiary dispute existed about Heard's intent. (Emphasis added.) *Heard*, 187 Ill. 2d at 60. We deem the *Cavazos* court as the better reading of *Heard*: evidence of other crimes can be used to prove intent, even if intent is not put expressly at issue because the burden remains on the prosecution to prove intent beyond a reasonable doubt regardless of whether the defendant disputes it. *Cavazos*, 2015 IL App (2d) 120444, ¶ 71 (citing *People v. Henderson*, 142 Ill. 2d 258, 319 (1990) (prosecution entitled to prove every element of crime charged even if defendant stipulates to facts establishing that very element)).

¶ 63    In addition, the other cases relied on by the court in *Clark* offer poor support for its position. In *Knight*, on which Davis also relies, the court offered no authority for its assertion that the State cannot use other crimes to prove intent where intent is not at issue. *Knight*, 309 Ill. App. 3d at 227. The same applies to *Clark*'s reliance on *People v. Lenley*, 345 Ill. App. 3d 399, 406-07 (2003). Were we to embrace the reasoning in *Knight*, *Lenley*, and *Clark*, a defendant could deprive the State of its right to introduce relevant, competent evidence simply by staying silent about certain elements of the offense for which he or she has been charged. That is out of step with the high burden placed on the State in a criminal prosecution. We hold, in accordance with *Cavazos*, that the State can introduce otherwise admissible other-crimes evidence to prove intent even where the defendant does not put intent directly in issue.

¶ 64    We also agree with the State that the other-crimes evidence—possession of firearms—relates to the issue of Davis's intent to distribute the cocaine. Illinois courts include weapons on the list of seven generally relevant factors to proving intent to deliver: (1) whether the quantity of drugs exceeds an amount for personal use; (2) the degree of purity of the controlled substance; (3) possession of weapons; (4) possession of large amounts of cash; (5) possession of police scanners, beepers, or cell phones; (6) possession of drug paraphernalia; and (7) the manner in which the drugs are packaged. *People v. Chavez*, 327 Ill. App. 3d 18, 25 (2001).

¶ 65    We agree that the 989-gram brick of cocaine found in the Honda was likely not for personal use, but no testimony was introduced about the cocaine's purity or the presence of electronic communication devices. And the persuasiveness of evidence of some paraphernalia—a scale—diminished severely when Gamboa testified that the scale was somehow destroyed before trial. Davis had $472 on him, which, while perhaps more than an average person might possess, falls within the realm of the ordinary. Finally, the packaging of the cocaine in one large brick, at the very least, does not indicate imminent delivery. *Cf. People v. Robinson*, 167 Ill. 2d 397, 411-12 (1995) (collecting cases describing narcotics contained in multiple individual packages). We find that the gun evidence was relevant and important circumstantial evidence to support

- 13 -

an inference that Davis intended to deliver the cocaine. We have held similarly. See *People v. Jones*, 269 Ill. App. 3d 797, 803 (1994) ("Not only is a reasonable inference of intent permitted when the amount of the controlled substance possessed could not be designed for personal consumption [citation], but the inference may be enhanced by the presence of weapons and large amounts of cash.").

¶ 66    Davis goes on to argue that even if the gun evidence was relevant, the manner in which it was introduced was prejudicial. He asserts that the "use of two separate witnesses to testify about the recovery of the guns" along with the in-court identification of the gun exhibits created a minitrial on the issue of Davis's possession of guns. We disagree.

¶ 67    When a court admits relevant other-crimes evidence, it "should carefully limit the details to what is necessary to illuminate the issue for which the other crime was introduced." *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995). The proceedings should not devolve into a minitrial on the uncharged offense. *Id.* Mok's testimony about the recovery of the guns was brief, covering about five pages of trial transcript. He did not go into excessive detail and gave basic information about the guns and ammunition he found. The second witness to testify about the guns, Gamboa, merely established the chain of custody for the items found in the car. For the gun evidence to have served its intended purpose of proving Davis's intent to deliver, the State had to establish that the gun evidence introduced at trial was the gun evidence found in the Honda. We do not see the manner in which the gun evidence as introduced going beyond the narrow purpose for which it was admitted.

¶ 68    Every case that Davis cites entailed a more heavy-handed emphasis on the other-crimes evidence. In *Nunley*, the State called three witnesses, two of whom testified to gruesome details of the stabbing of a person and killing of a dog that led to the defendant's arrest for the separate murder for which he was on trial. *Id.* In *People v. Bedoya*, 325 Ill. App. 3d 926, 940 (2001), the State presented 7 witnesses about previous shootings, introduced 22 photographs, and admitted bullets and bullet casings as exhibits. In *People v. Brown*, 319 Ill. App. 3d 89, 97 (2001), 6 of the State's 12 witnesses testified about the other-crimes evidence, 4 of them testifying exclusively about it. We do not agree that the gun evidence in Davis's case similarly shifted focus from the crime; the possession of the guns was part of the same course of conduct as the possession of the drugs. See *People v. Pikes*, 2013 IL 115171, ¶ 20 (other-crimes evidence admissible where "it is part of the 'continuing narrative' of the charged crime" because "[s]uch uncharged crimes do not constitute separate, distinct, and disconnected crimes").

¶ 69    The trial court properly allowed the State to admit evidence of Davis's concurrent gun possession and properly limited the evidence presented to information necessary to prove that possession. Having found no error, there can be no plain error. *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 43. We affirm the trial court's admission of the gun evidence.


¶ 70                                                    *Sentencing*

¶ 71    Finally, Davis argues that we should reduce his 25-year sentence to the 15-year statutory minimum or remand for resentencing for two reasons: (i) the trial court abused its discretion and imposed an excessive sentence and, alternatively, (ii) the trial court failed to adequately explain its reasons for imposing the 25-year sentence. We disagree with both arguments. We review a trial court's sentencing determination for an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). An abuse of discretion occurs when the sentence (i) is

- 14 -

"manifestly unjust or palpably erroneous," (ii) plainly departs from the spirit of the law, or (iii) is disproportionate to the nature and seriousness of the offense. *People v. Anderson*, 112 Ill. 2d 39, 46 (1986).

¶ 72   Possession with intent to deliver a controlled substance classifies as a Class X felony, with punishments set out in the Illinois Controlled Substances Act (720 ILCS 570/401(a) (West 2012)). The sentence for possessing "900 grams or more of any substance containing cocaine" ranges from "not less than 15 years and not more than 60 years." *Id.* § 401(a)(2)(D).

¶ 73   Davis argues the trial court abused its discretion by not adequately considering mitigating factors when imposing the 25-year sentence. He contends the nonviolent nature of the offense, his lack of criminal background, his substance use and mental health problems, and his family connections justify the minimum. Davis additionally argues that the trial court improperly considered the amount and dangerousness of cocaine when determining the seriousness of his crime because the legislature took that factor into account when creating the statutory sentencing range. The State responds that the seriousness of the crime justified sentencing Davis above the minimum.

¶ 74   Davis believes that the trial court should have given more weight to the mitigating factors in the PSI. When determining an appropriate sentence, the trial court weighs all the relevant factors. *Stacey*, 193 Ill. 2d at 209. These factors include the nature of the offense, the defendant's criminal history, any mental health issues, and social environment, among others. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). Absent evidence in the record, we presume the trial court took mitigating factors presented at sentencing into account. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 123. Even if we would have weighed the factors differently, we will not substitute our judgment for the trial court's. *Id.* ¶ 122.

¶ 75   The trial court expressly considered Davis's lack of a criminal history. The trial court mentioned it reviewed the PSI and the information about Davis's background, including his substance use and mental health history. The trial court was not obligated, however, to give the mitigating evidence in the PSI greater weight than the seriousness of the offense. *People v. Sims*, 403 Ill. App. 3d 9, 24 (2010). Given the crime's seriousness and the harm threatened by Davis's conduct, we cannot say the trial court abused its discretion, even though this was his first conviction.

¶ 76   We also cannot say that the trial court departed from the spirit or purpose of the law. The officers found Davis in possession of a kilogram of cocaine, three loaded firearms, and a substantial amount of ammunition. Davis cites this court's decision in *People v. Busse*, 2016 IL App (1st) 142941, ¶¶ 15-17, to support excessiveness due to the nonviolent nature of his offense. In *Busse*, this court found a 12-year sentence for burglary greatly departed from the spirit and purpose of the law where a defendant stole $44 worth of quarters from vending machines. *Id.* ¶ 29. Unlike Davis, who possessed three loaded firearms, Busse was unarmed. *Id.* Twenty-five years does not frustrate the spirit and purpose of the law, unlike a defendant given a twelve-year sentence for a petty crime.

¶ 77   The seriousness of the offense serves as the most important factor. *Willis*, 2013 IL App (1st) 110233, ¶ 123; Ill. Const. 1970, art. I, § 11; 730 ILCS 5/1-1-2 (West 2014). Chicago police and federal agents found Davis with nearly a kilogram of cocaine, three handguns, several magazines, and live cartridges. Davis admitted to purchasing two handguns and cocaine to sell. The seriousness of Davis's crime cannot be doubted.

¶ 78    Davis correctly asserts that the potential societal danger posed by the quantity of drugs cannot be employed as an aggravating factor; the legislature used this factor when creating the sentencing range. *People v. Corn*, 358 Ill. App. 3d 825, 827-28 (2005). A sentencing judge, however, can properly consider the quantity of drugs as an aggravating factor when determining the seriousness of the offense. *People v. Garcia*, 2018 IL App (4th) 170339, ¶¶ 41-42. The legislature explicitly allows trial courts to do so. 720 ILCS 570/411(2) (West 2012).

¶ 79    The trial court imposed a sentence on the lower end of the 15- to 60-year range. Any amount in excess of the statutory minimum of 900 grams can justify a lengthier sentence. Davis's sentence resides 10 years higher than the minimum and 35 years lower than the maximum. On this record, we cannot say that the trial court abused its discretion.

¶ 80    The trial court also can consider the specific degree of harm threatened by the defendant's conduct. *People v. Robinson*, 391 Ill. App. 3d 822, 844 (2009). The record, however, does not show that the trial judge focused on the general danger to society posed by Davis's conduct. Instead, the trial judge stated that he considered the facts along with Davis's background. Even though this was Davis's first conviction, Davis admitted that he sold cocaine four to six times before. Davis also possessed three loaded handguns, three regular magazines, an extended magazine with double capacity, and live cartridges. Taken together, Davis's conduct posed a potential for specific harm that justifies aggravating his sentence.

¶ 81    Absent evidence to rebut the presumption that the trial judge considered all of the factors in aggravation and mitigation, we defer to the trial court's judgment

¶ 82    Davis alternatively argues that his case should be remanded for resentencing because the trial judge failed to adequately state his reasons for imposing the sentence. Davis acknowledges that Illinois law does not require a judge to state reasons for imposing a sentence. *People v. Davis*, 93 Ill. 2d 155, 157-58, 162 (1982) (interpreting "shall" in section 5-8-1(b) as directory, not mandatory, where Unified Code of Corrections requires " 'sentencing judge in each felony conviction shall set forth his reasons for imposing the particular sentence he enters in the case' " (quoting Ill. Rev. Stat. 1979, ch. 38, ¶ 1005-8-1(b) (now codified at 730 ILCS 5/5-4.5-50 (West 2014)))). We affirm and note that even though Illinois law does not require it, the trial judge adequately stated his reasons.

¶ 83    Since *Davis* in 1982, appellate justices have encouraged trial courts to more thoroughly discuss their reasons for imposing sentences so as to aid appellate review and enhance the perception of justice. *People v. Jackson*, 375 Ill. App. 3d 796, 805 (2007) (McDade, J., specially concurring); *id.* at 809 (Wright, J., concurring in part and dissenting in part); *People v. Bryant*, 2016 IL App (1st) 140421, ¶¶ 26-35 (Hyman, J., specially concurring). We continue to urge trial courts to thoroughly explain the sentences they impose.

¶ 84    The trial judge stated, "Considering the fact that you have no prior background and considering the facts in this case, I think the appropriate sentence is a lesser in the range, therefore, I am going to give you 25 years." The judge listed the amount of drugs found in Davis's possession, the conditions under which the drugs were recovered, and Davis's background, and referred to the PSI when imposing the sentence. All of this involves more than a bare-bones recitation regarding the factors in mitigation and aggravation. The judge offered enough insight into the sentence to allow for adequate appellate review.

¶ 85    Affirmed.