**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190207-U

Order filed November 8, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0207 Circuit No. 18-CF-214 |
| | ) | |
| TAMIL ADAMS, | ) ) | Honorable Howard C. Ryan Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Presiding Justice McDade and Justice Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1   *Held*:  (1) The State proved defendant guilty beyond a reasonable doubt; (2) defendant's sentence was not grossly disparate; (3) defendant's felony murder conviction and sentence do not violate the proportionate penalties clause of the Illinois Constitution; (4) the automatic transfer provision is not unconstitutional on its face or as-applied to defendant; (5) the court properly admitted other-crimes evidence; (6) the court did not err by denying defendant's motion to suppress; and (7) defendant was not provided ineffective assistance of counsel.

¶ 2   Defendant, Tamil Adams, appeals his conviction for felony murder. Defendant argues:

(1) the evidence was insufficient to prove him guilty beyond a reasonable doubt; (2) his sentence

was grossly disparate to that of his codefendant; (3) the felony murder statute violates the proportionate penalties clause; (4) the automatic transfer provision is unconstitutional; (5) the court erred by admitting other-crimes evidence; (6) the court erred by denying his motion to suppress statements; and (7) he received ineffective assistance of counsel. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant by indictment with felony murder (720 ILCS 5/9-1(a)(3) (West 2018)). In the indictment, the State alleged that on or about May 22, 2018, defendant, while committing a robbery, shot and killed Maria Delatorre. Defendant was 16 years old at the time of the offense. The matter was automatically transferred to adult court. 705 ILCS 405/5-130 (West 2018).

¶ 5        Prior to trial, the State moved to admit evidence of defendant's other crimes. The State sought to introduce evidence that defendant had committed a prior robbery with a handgun at the same location that the murder occurred, 213 West 9th Street, Streator, Illinois. The motion identified three juveniles who would testify that while at 213 West 9th Street, defendant utilized a gun and robbed them of "weed" and money. While the juveniles did not provide an exact date and their timelines differed slightly, they indicated this previous robbery took place within a few months prior to the murder. The State sought to introduce this evidence to show defendant's knowledge of the residence, knowledge that individuals who were often at the residence routinely had illicit drugs and money, and motive and intent to commit a robbery at the residence. The court granted the motion over defendant's opposition, allowing the other-crimes evidence to be admitted with a limiting instruction.

¶ 6        Defendant moved to suppress statements he made to officers on May 23, 2018. He argued that his statements were not voluntary as required by the fifth amendment. In this regard,

2

defendant argued that he was 16 years old, he had difficulty reading, at the time of the statements over 12 hours had elapsed since his arrest and he was exhausted, defendant's mother did not want him interviewed until she arrived on May 24, defendant was not informed that his mother was coming on May 24, and defendant was not allowed to consult with a concerned adult.

¶ 7 During the hearing on the motion, the court acknowledged that the burden was on the State, but had the defense put on its evidence first. After inquiring about the process and hearing the court's explanation, defense counsel stated, "That makes perfect sense and I think it's frankly a better system anyway." Defendant testified that he had completed tenth grade. Defendant could read and write, but he could not comprehend everything that he read. Defendant did not have to read anything during the course of the police interview. Defendant stated that hours had passed between his arrest and when he was questioned by officers. At the beginning of the interrogation, he felt tired, hungry, and scared. Defendant had not been fed. Defendant testified that when asked, he said he wanted an attorney. Defendant later changed his mind and agreed to speak with the officers because the officers told him they would not tell him why he was being detained unless he talked to them. Defendant did not understand all the questions asked of him because he was confused and had never been interrogated before. The officers never asked if defendant wanted a parent or other adult present for the interrogation. If defendant knew he could have called his mother or father, he would have. Defendant would have liked to have his parents present for the questioning.

¶ 8 Streator Police Detective Jason Moore testified that defendant arrived at the Streator Police Department at approximately 5:15 a.m. on May 23. Because defendant was 16 years of age, Moore attempted to contact a family member for defendant. Moore determined that defendant had an aunt, Arista Stevenson, that lived in Streator and attempted to contact her at her

3

residence but was unsuccessful because he had an incorrect address. Moore then called Streator High School in search of contact information. Moore was able to obtain a contact number for Stevenson. Moore called Stevenson, and she identified herself as defendant's aunt. Moore advised Stevenson that defendant was in custody. Stevenson then went to the Streator Police Department. Stevenson did not have a phone number for defendant's parents but was able to contact defendant's mother through Facebook messenger. Stevenson advised Moore that defendant's mother told her to tell the officers not to speak with defendant because she would not be able to make it to the police department until the next day. Moore did not ask defendant for his mother's or father's phone number. Moore did not tell defendant that his mother wanted to be present for the interview.

¶ 9        Moore ultimately attempted to interview defendant at approximately 1 p.m. on May 23. Streator Police Detective Troy Dodge was also present. Defendant did not appear to be under the influence of alcohol or drugs. Defendant was coherent. Moore did not promise defendant anything for making a statement. Moore did not coerce or threaten defendant. Defendant was provided access to a restroom when needed. Dodge advised defendant of his *Miranda* rights. Defendant was specifically asked if he wanted a lawyer and defendant said that he did.

¶ 10       At that time, Moore and Dodge ended the interview and exited the interview room. Moore then went to put defendant in a cell or on a bench. As Moore was doing that, defendant told Moore he would talk to Moore without a lawyer. Defendant initiated this conversation and said he wanted to talk to Moore about the case. Moore did nothing to initiate that conversation. Moore then contacted Dodge and they, along with defendant, went back into the interview room. Dodge again read defendant the *Miranda* warnings and defendant agreed to answer questions without an attorney. Moore did not promise defendant anything and he did not coerce or threaten

4

defendant. Defendant then spoke to Moore and Dodge for a brief time. To the best of Moore's knowledge, the statements made by defendant were freely and voluntarily given. Moore never told defendant that he would not tell defendant what he was being detained for unless defendant agreed to talk with him. Defendant's answers were responsive to the questions Moore asked.

¶ 11     From the time defendant arrived at the police station at approximately 5:15 a.m. until he was questioned around 1 p.m., Moore did not provide defendant with food because defendant did not request any. Moore did not offer defendant coffee or caffeine prior to the interview. Defendant did not request anything from Moore.

¶ 12     The State introduced the recording of defendant's interview. The recording shows that defendant's answers are responsive to Moore's and Dodge's questions. It also shows that defendant was Mirandized. Further, the recording shows Moore confirm with defendant what had happened after the initial interview was terminated when defendant requested a lawyer—that when Moore was putting him on a bench, defendant told Moore he would talk to Moore without a lawyer.

¶ 13     The court ultimately denied the motion to suppress. It found that defendant's statements were made freely and voluntarily, given the totality of the circumstances. The court noted that defendant initially requested a lawyer, and the officers stopped the interview. The court found that defendant then reinitiated the conversation and was again Mirandized. The court stated that defendant was not denied any food or water and was not denied use of the restroom. Further, the court specifically noted that it watched the interrogation and that "[t]his young man knew his rights." Specifically, toward the end of the interview, defendant said they were done talking and the interview was over. The court stated "[defendant] knew his rights when he was going through this." The court did not believe defendant "was of such infirm years in his mind or his views that

5

he was unable to or was coerced or overborne by any police adult presence." It noted defendant was calm and "[defendant] knew what he was doing, and he had [a] great conversation."

¶ 14     The matter proceeded to a jury trial. The following summarizes the trial testimony and evidence pertinent to this appeal. On May 22, 2018, Maria Delatorre lived at 213 West 9th Street in Streator, Illinois. She lived there with her three children, Anthony C., Mariah C., and Elijah D. On the evening of May 22, Delatorre was shot and killed outside of her residence.

¶ 15     Dominic H. testified that he was 16 years old and lived in Streator. Anthony was his friend, and he would hang out at Anthony's house at 213 West 9th Street. It was common for Dominic and other friends to hang out at Anthony's house. While there, they would typically drink alcohol and smoke marijuana. Approximately two months before Delatorre's murder, Dominic saw defendant at Anthony's house for the first time. Defendant was there with his "sister" Anaya. On that day, they drank alcohol and smoked marijuana.

¶ 16     The second time that Dominic saw defendant at Anthony's house was approximately one month before Delatorre's murder. On that evening, Dominic, Anthony, defendant, and Chase N. were present. They were smoking marijuana in Anthony's bedroom. Dominic fell asleep. When Dominic awoke, defendant was holding a gun in Dominic's face. Defendant told Dominic to empty his pockets, and Dominic told defendant he did not have anything other than his cell phone. Defendant told Dominic to give him the phone and defendant would put it in the mailbox. Defendant pointed the gun at Anthony and Chase and took approximately $500 to $600 from Chase and approximately 20 grams of marijuana that belonged to Dominic, Anthony, and Chase. None of them were selling marijuana. Defendant took all of their phones and told them he would put the phones in the mailbox and not to go out there until 10 minutes had passed. Defendant also said that if they contacted his sister "he was coming back for murder." Defendant then left

the house. Dominic waited 10 to 15 minutes then went outside, grabbed his phone from the mailbox, and ran home. Dominic did not tell anybody about this event and did not contact the police.

¶ 17     Anthony C. testified that he was 15 years old and on May 22, 2018, he was living at 213 West 9th Street with his mother, Delatorre, and his siblings, Mariah and Elijah. At that time, he had a group of friends that he would hang out with in his bedroom. Anthony knew defendant and that defendant's nickname was Tarentino. Anthony met defendant through a friend, Brandon W., approximately one month before May 22. Anthony, Brandon, and defendant hung out in Anthony's bedroom. Typically, when Anthony and his friends hung out in his bedroom they would talk, smoke marijuana and drink alcohol.

¶ 18     Anthony saw defendant again the day after meeting him. Defendant was at Anthony's house along with Jase H., Chase, and Dominic. At some point, Jase left and Anthony, defendant, Dominic, and Chase continued hanging out in Anthony's bedroom. Defendant told them he knew someone in Chicago that he could rob and asked Chase if he could use Chase's gun that Chase had with him. Defendant then "snatched" the gun from Chase. Defendant pointed the gun at Chase's head and demanded Chase give him his money and marijuana. Anthony stated that defendant also pointed the gun at Anthony and Dominic and "demanded [we] give him our things." Anthony was not sure how much money or marijuana defendant took that day. The marijuana defendant took belonged to Chase. Defendant told them he would leave their cell phones in the mailbox. Defendant left and took the gun with him. Dominic, Chase, and Anthony waited approximately three minutes and then went to the mailbox where they found their cell phones. Chase and Dominic then went home. Anthony did not report the incident to police because he did not want to get his friends in trouble.

7

¶ 19        On May 22, Anthony was home with Delatorre and his siblings. Delatorre and his siblings left the house around 6 p.m. Anthony was then home alone and cleaning his bedroom. Anthony's dog was with him in his bedroom. Anthony identified a photograph marked as the State's exhibit No. 2 as a photograph of his back door, and his bedroom window. There was a couch underneath the window. Anthony began getting ready for bed. Anthony then saw his bedroom doorknob twist. Anthony shouted to see who was there, but no one answered. Anthony opened his bedroom door and after not seeing anyone there, he checked his window. Anthony saw two black males standing by the back door and recognized one of them as defendant. Anthony recognized defendant from a prior encounter and previously being robbed by defendant. Anthony did not recognize the other black male and described him as having a beard.

¶ 20        Anthony asked who was there or what they wanted, and defendant said he had the money to give back. Defendant said it was Anaya's brother. Anthony knew Anaya and said she and defendant called each other cousins. After Anthony refused to open the door, defendant came toward the window and pulled a gun from his waist and "said to open the F'ing door." Anthony testified that the gun was gray and was not "one of those old-fashioned guns where you can see the barrel."[1] Anthony testified that defendant did not say what he wanted and did not demand anything from him. Defendant pointed the gun at Anthony while Anthony was at the window. In an aggressive tone, defendant told Anthony to open the door. Anthony then agreed to open the door. However, Anthony's dog was barking so he tried to put the dog in his cage, but the dog pulled away from him and jumped toward the window. Anthony heard a gunshot. Defendant was at the window when Anthony heard the gunshot. Anthony could not say for certain that

_____

[1]The parties later stipulated that Anthony told detectives on May 23, that the gun was "an old-fashioned gun" where "you can see the barrel."

defendant fired the gunshot because he was not looking at the window when the gunshot was fired. The other black male did not approach the window and was off to the side. Anthony never saw a gun or any weapon on the other black male.

¶ 21        When Anthony heard the first gunshot he ran toward the front door. While running, Anthony saw Mariah in the kitchen and told her to run. Mariah ran out the front door, followed by Anthony. Anthony ran into the woods across the street.

¶ 22        A few hours later, in the middle of the night, Anthony gave a statement to the police. Anthony did not tell them the truth at that time because he did not want to get his friends in trouble. Anthony did not immediately mention defendant to the police. He was "[i]n total disbelief, shocked" and "shut down."

¶ 23        Anthony admitted that people would come to his house to buy marijuana out of his bedroom from Chase. Anthony did not always know when people were coming to buy marijuana. There was usually money and marijuana in Anthony's bedroom.

¶ 24        Valentin Chavez testified that he was with Delatorre on May 22, 2018. Delatorre, along with Mariah, Elijah, and a male driver that Chavez did not know picked Chavez up from work. When they arrived at Delatorre's home, Mariah exited the car first and entered the house. Chavez began walking toward the house. He heard gunshots and saw Mariah crying and running out of the house. Chavez also saw Anthony run out of the house after Mariah. Chavez turned around and saw Delatorre fall down. He heard the gunshots prior to Delatorre falling down. He heard five gunshots and they sounded like they were coming from inside the house. Chavez did not see who fired the gunshots.

¶ 25        Mariah C. testified that she was 10 years old. On May 22, 2018, at approximately 7 or 8 p.m., Mariah, Delatorre, and Elijah left their house at 213 West 9th Street to pick up Chavez. A

9

man Mariah believed to be named Donny drove them. When they arrived back home, Mariah noticed a black car parked in front of her house that was not there when they left. Mariah exited the car and ran into the house. Mariah entered through the front door, into the living room and then the kitchen. From the kitchen, Mariah could see to Anthony's bedroom. Mariah saw Anthony and their dog in Anthony's bedroom. Anthony loudly told Mariah to run. Mariah ran toward the front door. While she was running out of the house, Mariah heard one or two gunshots. Mariah ran toward the woods and heard more gunshots. When Mariah reached the edge of the woods she stopped and looked back toward her house. Mariah saw two black males running under the carport. One of the males "had like twisty hair kind of." One of them had a short gray gun, a handgun. It was a small gun that is held in the hand. The black males ran to the black car that had been parked in front of the house. A female was in the black car. Once the males entered the black car, it sped off.

¶ 26     Mariah then entered the house looking for her dog because she heard him crying. When she did not find him, Mariah came outside and saw her mother, Delatorre, on the ground bleeding. Mariah was interviewed by the police a few hours after this happened. At that time, she "was kind of shocked" and "a little upset." Mariah admitted that during the interview she told the police that there was a shotgun. During her trial testimony, Mariah indicated that she believed a shotgun and a pistol were the same thing. Mariah testified that the gun she saw the black male holding was as she described it during her trial testimony. Mariah also admitted telling the police that both males had guns—one long gun and one short gun. Mariah also spoke with the police about Brandon driving a black car, but testified it was not Brandon's car. Mariah did not see Brandon at the time Delatorre was shot. Mariah reiterated that a female was driving the black car.

10

¶ 27    Andrew Kochis testified that he lived approximately four or five houses away from 213 West 9th Street. On May 22, 2018, at approximately 8:30 p.m., Kochis was pulling into his driveway and heard a loud pop, another pop, and then four more pops back to back. Almost immediately, he saw a black four-door sedan speeding past his house.

¶ 28    Hashim Waite testified that he was 25 years old and lived in Chicago. Defendant had been his friend for approximately two years. Defendant's nickname is Tarentino. Waite knew Ashanti Roberts from his neighborhood. On May 22, 2018, Waite was with defendant. They made plans to "go hit this lick," which Waite explained meant to commit a robbery. Waite and defendant made the plan to commit a robbery about a week before May 22. Defendant started this conversation. Defendant originally stated they needed to commit the robbery in Kankakee but Waite later learned it was actually in Streator where defendant wanted to commit the robbery. Waite had never been to Streator before May 22. Defendant told Waite that they were "going to get some weed and some money," and defendant knew where it was because defendant had "robbed them before." Waite elaborated that defendant had told Waite that he had previously robbed these juveniles—the intended targets of the robbery—with their own gun.

¶ 29    Waite was willing to take part in the robbery because he needed money. Waite thought it was going to be an easy robbery based on defendant's description of the prior robbery. On May 22, Waite met with defendant and Roberts. Neither Waite nor defendant had a car, but Roberts had a black four door car. Waite drove them from Chicago to Streator. Defendant put the address into the GPS. They initially went to the wrong address. Waite then pulled into a parking lot and defendant "was doing something on the phone and just got the address." Defendant then put the new address into the GPS. Waite could not remember the address other than that it was on 9th Street. Waite, Roberts, and defendant went to Streator "[t]o hit the lick."

11

¶ 30    When Waite, Roberts, and defendant left Chicago in Roberts's car, Waite had a loaded Browning .9-millimeter firearm. When they arrived at the second location that defendant had entered into the GPS they parked in front of the house. When they exited the car, Waite gave defendant the gun. Waite did not know why he gave the gun to defendant. Roberts got into the driver's seat. Waite and defendant then walked to the back of the house, with defendant leading the way. They went to the back door. Waite identified the back of the house they were at on May 22 in the photograph marked as People's exhibit No. 2. Defendant walked into the house through the back door. Waite stood outside. Defendant returned saying there was a big dog in the house.

¶ 31    After defendant came back out of the house, a young person stuck his head out of the window asking who was there. Defendant said it was Anaya's brother. The young person asked if it was defendant. Defendant said he was trying to give the young person his stuff back. Waite told the young person to open the door and let them in. Waite then noticed headlights in the driveway. Defendant pulled the gun out and pointed it at the young person. While pointing the gun at the young person, defendant "said give me that shit." Defendant looked like he was going to go through the window. Defendant fired a shot through the window and ran into the house through the back door. As soon as defendant entered the house, Waite heard four gunshots. Defendant exited the house and said they were "supposed to be gone." Waite asked defendant if "he grab[bed] the shit," because that is what they went to Streator for. Defendant told Waite to "come on" and they started running toward the car. Waite heard three more gunshots when they were in the front yard. At that time, Waite turned and looked at defendant "to make sure he wasn't shooting in [Waite's] direction."

¶ 32    Waite and defendant entered the black car. Waite yelled at defendant because he was not supposed to shoot the gun. Waite took the gun from defendant and wiped it off to get any prints

12

off of it. Defendant told Waite he thought he shot two or three people. Minutes after leaving the scene, a squad car with its lights activated got behind the black car. A second squad car got in front of them, but they went around that squad car. There was a car chase and Roberts lost control of her car and crashed. Prior to the crash, when the police were behind them, Waite gave the gun to defendant to run with because he did not want to be caught with it. Waite, defendant, and Roberts exited the car and ran. Waite was apprehended approximately 10 minutes later.

¶ 33        Waite admitted to having two prior felony convictions—aggravated unlawful use of a weapon and unlawful possession of a firearm by a felon. Additionally, at the time Waite was testifying, he was charged with murder. In exchange for Waite providing truthful testimony in the present case, the State agreed to instead file a home invasion charge against him, to which Waite would plead guilty and be sentenced to 30 years' imprisonment. Waite would be eligible for day-for-day good-conduct credit.

¶ 34        Donald Shultheis testified that on May 22, 2018, he spent the day with Delatorre. That evening, Shultheis, Delatorre, Mariah, and Elijah went in Shultheis's truck to pick up Chavez. After stopping at Circle K, they went to Delatorre's house. When they arrived, Shultheis noticed a black car beyond the driveway that was not there when they left the house. Delatorre opened the door to the truck and while she and Shultheis were talking, Shultheis heard two gunshots. He knew they were gunshots because he had spent time in the military. Shultheis saw two black males run from behind the house, underneath the carport, and then by his truck. Shultheis testified that the males got to the front of Shultheis's truck, and one fired "two shots right in front of my face." The shots were fired across the hood of his truck. At that point, Delatorre fell. Shultheis ducked down and when he stood up, he saw the males entering the black car. He heard at least one gunshot when they were driving off. Shultheis saw one gun and it was a pistol.

13

¶ 35 Brandon W. testified that on May 22, 2018, he was 15 years old. He did not drive and did not have access to a car.

¶ 36 Retired Village of Dwight Police Officer Mark Scott testified that on the evening of May 22, 2018, he was involved in a vehicle pursuit. The vehicle crashed, and he saw a black male exit the vehicle and run. A female, that Scott thought was Caucasian, wearing a light blue jacket or sweatshirt exited the driver's door and ran in the same direction. Around 4:20 a.m. the next morning, Scott received a call that a black male and black female walked out of the field and were heading toward Circle K. Scott proceeded to that location and observed a black male and a black female wearing a light blue shirt or jacket walking into the gas pump area. Scott recognized the light blue shirt as the one the female driver who exited the crashed vehicle was wearing. Those individuals were taken into custody, and Scott identified defendant as the black male.

¶ 37 Livingston County Sheriff's Deputy Emily Anderson Frobish testified that while working on May 22, 2018, she received a call that a shooting had just occurred in Streator and a black four-door car had left the scene traveling southbound on Route 23. Frobish headed westbound on Route 17 hoping to intercept the vehicle. She encountered a speeding vehicle matching the description, began following it, and eventually activated her lights. Frobish pursued the vehicle. The vehicle crashed and Frobish observed two black males exit the passenger side. Frobish pursued one male but lost sight of him.

¶ 38 Pursuant to stipulations of the parties and testimony from law enforcement and crime laboratory personnel, the following information was presented at trial. Shell casings and projectiles from a .9-millimeter firearm were recovered from the crime scene. A Browning .9-millimeter handgun was recovered approximately 35 feet northeast of where Roberts's car

14

crashed following the police chase. The recovered shell casings and projectiles came from the recovered Browning .9-millimeter handgun. Testing of the shell casings and handgun revealed neither fingerprints suitable for comparison nor a human DNA profile. Gunshot residue testing revealed that Roberts and Waite "may not have discharged a firearm with either hand" and that if either discharged a firearm the particles were removed, not deposited, or not detected. Defendant could be excluded from having contributed to major DNA profiles collected from various articles of clothing found in Roberts's vehicle; however, various articles of clothing also had minor DNA profiles that were potentially incomplete and unsuitable for comparison.

¶ 39    The jury found defendant guilty. The court polled the jury and each juror responded affirmatively that their verdict was guilty. Juror Ronald Widmer responded "Yeah." The transcripts did not reveal any other statements by Widmer.

¶ 40    Prior to sentencing, defendant filed a motion for new trial and a supplemental motion for new trial. As relevant here, at the hearing on the motion, counsel argued that hours after the verdict was read, Widmer called defense counsel and stated that he was not aware he could maintain his decision of not guilty when the other jurors decided to vote guilty. Additionally, defense counsel alleged that during polling of the jury, Widmer hesitated and was shaking his head while he said "Yeah." Further, that after the last juror was polled, Widmer turned to the defense table and said "I'm sorry, man. I tried." Counsel noted his unsuccessful attempts to obtain an affidavit from Widmer.

¶ 41    The court denied the motion. In doing so, it noted the absence of an affidavit from Widmer, but also stated that the transcript does not bear out that Widmer made the statements as represented by counsel and that the court "would be confident that the reporter would catch that if that statement was made." Further, the court stated it did not see Widmer shake his head and

15

that the answer "[y]eah" was not "an uncommon term for a positive reaction or a response." The court determined it was not hesitant or ambiguous such that the court should have made further inquiry. The court also found that it could not get into how the jury or a particular juror came to its decision short of certain circumstances not present in this case.

¶ 42    The matter proceeded to sentencing. The court set forth the sentencing range of 20 to 60 years' imprisonment and noted that it could impose a firearm enhancement. The court declined to impose the firearm enhancement. It sentenced defendant to 35 years' imprisonment followed by 3 years' mandatory supervised release. Defendant appeals.

¶ 43                                    II. ANALYSIS

¶ 44                            A. Sufficiency of the Evidence

¶ 45    Defendant argues that the State failed to present sufficient evidence to prove him guilty beyond a reasonable doubt. In addition to generally pointing to discrepancies in witness testimony, defendant argues that the State failed to prove he was attempting to commit a robbery, as charged, and that Delatorre was not killed during the commission of the attempted robbery or as a direct and foreseeable consequence of it.

¶ 46    When a defendant challenges the sufficiency of the evidence, we must determine whether the evidence, viewed in the light most favorable to the State, permits any rational trier of fact to find the elements of the offense proven beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Witness credibility and the weight given to testimony are determinations left to the trier of fact. *People v. Nitz*, 143 Ill. 2d 82, 95 (1991). "When the facts in a case give rise to more than one inference, a reviewing court shall not substitute its judgment

16

for that of the trier of fact unless the inference accepted by the trier of fact is inherently impossible or unreasonable." *People v. Price*, 225 Ill. App. 3d 1032, 1035 (1992). We will not retry the defendant and must allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 47　　　First, as to defendant's general arguments regarding the various discrepancies between witnesses, such discrepancies are to be expected when several persons witness an event under traumatic circumstances and were issues for the jury to resolve as the trier of fact. See *People v. Jackson*, 2020 IL 124112, ¶¶ 65-66.

¶ 48　　　Turning to defendant's more specific arguments, he first asserts that the evidence was insufficient to establish he was attempting to commit a robbery, which is the predicate forcible felony alleged in the indictment. "A person commits robbery when he or she knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-1(a) (West 2018).

¶ 49　　　Here, testimony from Waite and Anthony readily establish that defendant attempted to commit a robbery. First, Waite testified that the plan was to commit a robbery. Defendant, Waite, and Roberts drove from Chicago to Streator to Anthony's residence to commit the robbery. Defendant had told Waite that he previously robbed juveniles at this residence. Waite further testified that while defendant was pointing the gun at Anthony, defendant told Anthony to "give me that shit." While Waite may have some credibility issues due to his prior crimes and the fact that he was a codefendant, his testimony is consistent with other evidence and credibility determinations are for the trier of fact. See *Nitz*, 143 Ill. 2d at 95. Anthony testified that defendant pointed the gun at him. Anthony also testified about a prior incident where defendant had robbed him and his friends, which is indicative of defendant's intent in this instance.

17

Viewing the foregoing in the light most favorable to the State, a rational trier of fact could find beyond a reasonable doubt that defendant was attempting to commit a robbery. See *Ross*, 229 Ill. 2d at 272.

¶ 50    Defendant next argues that the State failed to prove that Delatorre was killed during the commission of the attempted robbery or as a direct and foreseeable consequence of it. He argues that the attempted robbery had ended at the time Delatorre was killed.

¶ 51    As charged in this case, an individual commits felony murder when he kills an individual without lawful justification and in performing the acts which cause death "he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 2018). "A killing that occurs during the course of an escape from a forcible felony is within the operation of the felony-murder rule." *People v. Klebanowski*, 221 Ill. 2d 538, 549 (2006).

¶ 52    Here, testimony at trial readily established that Delatorre was shot and killed while defendant was fleeing the scene after his failed robbery attempt. In other words, the killing occurred during the course of defendant's escape from a forcible felony and is thus, within the operation of the felony-murder rule. See *id.* Our supreme court has rejected defendant's argument that he is not accountable for felony murder when the killing occurred after the forcible felony—here, attempted robbery—had ended. See *id.* at 545-51. Additionally, while defendant raises the issue of who fired the gun and indicates it may have been Anthony, our supreme court has noted it is immaterial whether the killing is actually committed by defendant, an accomplice, or a third party reacting to the commission of the felony. See *People v. Allen*, 56 Ill. 2d 536, 544-45 (1974). Based on the foregoing, a rational jury could find beyond a reasonable doubt that Delatorre was killed during the commission of the attempted robbery or as a direct and foreseeable consequence of it.

¶ 53                                    B. Sentencing Disparity

¶ 54        Defendant argues that his sentence is grossly disparate in violation of due process and the

Illinois Constitution's proportionate penalties clause in comparison to the sentence imposed upon

Waite.

¶ 55        As an initial matter, as argued by the State, defendant has forfeited this issue by failing to

raise it in the circuit court. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (generally, a

defendant must object to an error at trial and raise the issue in a posttrial motion in order to

preserve it for appellate review). Defendant acknowledges that he did not raise the issue in the

circuit court but asserts in his reply brief that this argument raises issues of substantial

constitutional rights, which appears to be an attempt at arguing for plain error review. See *People

v. Lindsey*, 309 Ill. App. 3d 1031, 1034 (2000) (noting that an error can amount to plain error if

"the defendant was deprived of substantial rights"). The first step in plain error review is to

determine if an error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Whether a

defendant was denied due process is a question of law reviewed *de novo*. *People v. Stapinski*,

2015 IL 118278, ¶ 35.

¶ 56        "Our supreme court has found that fundamental fairness requires that 'similarly situated'

codefendants, who were involved in the same crime, should not 'receive grossly disparate

sentences.' " *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 53 (quoting *People v. Fern*, 189

Ill. 2d 48, 58 (1999)) (citing U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §§ 2, 11). "To

prevail on a claim of disparate sentencing, a defendant bears the burden of demonstrating that he

and his codefendant were both (1) equally culpable and (2) 'similarly situated with respect to

background, prior criminal history, and potential for rehabilitation.' " *Id.* (quoting *People v.*

*Ramos*, 353 Ill. App. 3d 133, 139 (2004)). "[A] plea of guilty is a relevant mitigating factor." *People v. Banks*, 241 Ill. App. 3d 966, 984 (1993).

¶ 57 Here, defendant's claim of grossly disparate sentences fails under the first prong because he and Waite were not equally culpable. Although defendant and Waite were legally equally culpable for felony murder, they were not equally culpable factually. Specifically, it was defendant's plan to commit the robbery and defendant provided the location. In fact, Waite had never been to Streator. Per Anthony and Waite's testimony, defendant pointed the gun at Anthony, not Waite. Further, Waite's testimony and inferences from Anthony's testimony indicate that defendant fired the shot that killed Delatorre. Additionally, Waite agreed to plead guilty to home invasion and a guilty plea is a relevant mitigating factor. See *id.* Because we find no error, we need not move on to the second step of plain error review.

¶ 58 C. Proportionate Penalties Challenge to the Felony Murder Statute

¶ 59 Defendant argues that the felony murder statute (720 ILCS 5/9-1(a)(3) (West 2018)) violates the proportionate penalties clause of the Illinois Constitution on its face and as applied to him. In this regard, defendant asserts that felony murder and home invasion as defined by section 19-6(a)(5) of the Criminal Code of 2012 (*id.* § 19-6(a)(5)) are identical offenses but have different sentences.

¶ 60 The constitutionality of a statute is reviewed *de novo*. *People v. Gray*, 2017 IL 120958, ¶ 57. "A statute is facially invalid only if there is no set of circumstances under which the statute would be valid." *Id.* ¶ 58. "An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36. The proportionate penalties clause is violated when offenses

20

with identical elements are subject to different penalties. *People v. Sharpe*, 216 Ill. 2d 481, 521 (2005).

¶ 61        Felony murder occurs when an individual is killed during the commission of a forcible felony or escape after committing a forcible felony. 720 ILCS 5/9-1(a)(3) (West 2018); *Klebanowski*, 221 Ill. 2d at 549. A person commits a home invasion under section 19-6(a)(5) when he enters a dwelling place of another without authority, knowing or having reason to know one or more persons is present and "[p]ersonally discharges a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person within the dwelling place." 720 ILCS 5/19-6(a)(5) (West 2018).

¶ 62        While defendant asserts he is making a facial challenge, he makes no cogent argument in this regard. Regardless, a cursory look at the elements of felony murder and the home invasion statute cited by defendant clearly establishes that the two offenses have different elements, such that there are many circumstances under which the felony murder statute would not violate the proportionate penalties clause. As examples, felony murder contains no element that defendant personally discharge a firearm and the home invasion statute has no requirement that an individual is killed.

¶ 63        Turning to the as-applied challenge, defendant asserts that a home invasion in violation of section 19-6(a)(5) which results in death by a firearm is also a felony murder under section 9-1(a)(3), but the offenses are subject to different penalties. Defendant fails to make any argument as to how this applies to his circumstances or how this fact makes defendant's conviction or sentence unconstitutional. See *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 29 ("A reviewing court is entitled to have issues clearly defined with *** cohesive arguments presented; this court is not a repository into which an appellant may foist the burden of argument and

21

research \*\*\*."). Notably, robbery was the forcible felony underlying defendant's felony murder charge, not home invasion. To the extent defendant was attempting to say his alleged conduct amounted to both a home invasion under section 19-6(a)(5) and a felony murder under section 9-1(a)(3), his argument fails. Defendant's conduct did not amount to a home invasion under that section. Specifically, defendant did not shoot and kill a person within the dwelling place because Delatorre was not in the dwelling when defendant entered. See *People v. Kolls*, 179 Ill. App. 3d 652, 656 (1989) ("The statute requires that the injury be inflicted on a person who was within the dwelling when the defendant made his unauthorized entry \*\*\*"). Based on the foregoing, defendant's proportionate penalties challenge to the felony murder statute fails.

¶ 64                              D. Constitutionality of the Automatic Transfer Provision

¶ 65        Defendant argues that the automatic transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2018)) violates due process and the Illinois Constitution's proportionate penalties clause on its face and as applied to defendant. Further, while specifically stating defendant is not raising an eighth amendment issue, he nonetheless asserts the automatic transfer provision violates it. As set forth above, the constitutionality of a statute is reviewed *de novo*. *Gray*, 2017 IL 120958, ¶ 57.

¶ 66        At the outset, we note that defendant's arguments in this regard are not clearly defined or cohesively presented. See *Edwards*, 2012 IL App (1st) 091651, ¶ 29. To the extent defendant's arguments can be deciphered, his attempted facial challenge(s) fail because the supreme court has held that the automatic transfer provision does not violate due process, the eighth amendment, or the proportionate penalties clause. See *People v. Patterson*, 2014 IL 115102, ¶¶ 89-110.

22

¶ 67    Defendant's attempts to distinguish *Patterson* and the cases cited therein appears to be his attempt at an as-applied challenge. Defendant argues, apparently based on the facts of this case, that the prosecutor has unbridled discretion on whether to charge a 16-year-old defendant with home invasion with a firearm causing death or the automatically transferable crime of felony murder. But there are plenty of circumstances where the prosecutor has no discretion on what to charge based upon the facts of the case as the facts will support only one possible charge. More importantly, and as stated above, this was not a case where the prosecutor had such discretion because defendant's conduct did not amount to a home invasion which caused a death by a firearm of an individual within the dwelling. See *supra* ¶ 63. Thus, this as-applied challenge likewise fails.

¶ 68                              E. Other-Crimes Evidence

¶ 69    Defendant argues that the circuit court erred by allowing evidence of a prior robbery defendant was alleged to have perpetrated.

¶ 70    A court's decision to admit other-crimes evidence is reviewed for an abuse of discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). An abuse of discretion exists when the court's decision is arbitrary, fanciful or unreasonable or when no reasonable person would take the position of the circuit court. *Id.* Evidence of other crimes is admissible to prove intent, identity, motive and any other relevant material fact other than propensity. *Id.* at 170; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) (providing that evidence of other crimes is admissible for some purposes such as proof of motive, intent, knowledge and identity). This evidence can be excluded "if the prejudicial effect of the evidence substantially outweighs its probative value." *Id.*; Ill. R. Evid. 403 (eff. Jan. 1, 2011) (providing that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

23

¶ 71    Here, the evidence of the prior robbery of Anthony by defendant at the same location as the current offense is highly probative of defendant's knowledge, intent and motive. Specifically, this evidence helped establish that defendant had knowledge that juveniles were routinely at the address and usually had drugs and money. Further, it is probative of motive and intent to commit another robbery of these juveniles because it was undisputed that none of the victims of the prior robbery reported it to police until after Delatorre was killed, making these juveniles seemingly easy targets. Further, defendant's argument in his brief that the evidence was inadmissible to prove intent because the intent to commit a robbery was not being contested, seemingly contradicts defendant's argument that the State failed to prove beyond a reasonable doubt that he had attempted to commit a robbery. Regardless, "the State can introduce otherwise admissible other-crimes evidence to prove intent even where the defendant does not put intent directly in issue." *People v. Davis*, 2019 IL App (1st) 160408, ¶ 63. Additionally, the court gave a limiting instruction regarding this evidence, which limited any potential prejudice and defendant makes no argument that the jury failed to follow the instruction. See *People v. Petrakis*, 2019 IL App (3d) 160399, ¶ 24. Based on the foregoing, we cannot say that the court abused its discretion in admitting the other-crimes evidence.

¶ 72                    F. Defendant's Motion to Suppress Statements

¶ 73    Defendant argues that the court improperly denied his motion to suppress statements made to the police. He largely relies on the fact that a parent or concerned adult was not present while he was questioned and argues that his statements were involuntary.

¶ 74    "[W]e review *de novo* the ultimate question of whether defendant's confession was voluntary after examining the totality of the circumstances" but will only overturn the circuit court's factual findings "if they are against the manifest weight of the evidence." *Patterson*, 2014

24

IL 115102, ¶ 37. In examining the totality of the circumstances "[r]elevant factors to consider include the minor's age, mental capacity, education, physical condition, the legality and length of the interview, and physical or mental abuse by the police, as well as the presence of a concerned adult and any attempts by the police to prevent or frustrate that contact." *Id.* ¶ 58. "[A] juvenile's confession should not be suppressed merely because he was denied an opportunity to confer with a concerned adult." *Id.* ¶ 65.

¶ 75    As an initial matter, defendant objects to the manner in which the hearing on the motion to suppress was conducted. However, he did not object during the hearing and in fact, his counsel told the court he believed it was "a better system." Further, the court explicitly acknowledged the burden was on the State. Thus, defendant forfeited this argument and in any event it is without merit.

¶ 76    Here, while defendant relies almost exclusively on the fact that he did not have a parent or concerned adult present, our supreme court has specifically stated that that fact alone is not reason enough to suppress a juvenile's statement. See *id.* Additionally, defendant never requested to speak with his parents or a concerned adult. Further, Moore's testimony at the hearing showed that he made reasonable efforts to contact defendant's parents. While defendant asserts that after he invoked his right to an attorney the officers told him they would not tell him why he was being detained unless he talked to them, this was rebutted by Moore's testimony. The court determined that defendant reinitiated the conversation and thus, impliedly found that Moore's testimony was credible on this point. This factual determination is not against the manifest weight of the evidence and thus, we will not overturn it.

¶ 77    Further, the recording of the interview shows that defendant's answers were responsive to the questions being posed such that there is no indication that defendant had trouble

understanding the process. More importantly, and as noted by the court, defendant ultimately did assert his rights and terminated the interview, further indicating he understood his rights and was capable of asserting them. Additionally, Moore testified that he made no promise or threats to defendant to convince him to speak and none were shown in the recording. Although defendant was not provided with food, Moore testified that defendant never requested any, such that he was not denied food. Defendant was 16 years old at the time of the interview, which the supreme court has indicated is " 'on the older end of the juvenile scale.' " *Id.* ¶ 67 (quoting *People v. Murdock*, 2012 IL 112362, ¶ 44). Based on the totality of these circumstances we conclude the circuit court did not err by denying the motion to suppress.

¶ 78                                    G. Ineffective Assistance of Counsel

¶ 79        Defendant argues that his trial counsel was ineffective for failing to subpoena a "juror who claimed he misunderstood the jury instructions and was not aware he could maintain his verdict of not guilty."

¶ 80        In order to establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[I]f [an] ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide whether counsel's performance was constitutionally deficient." *People v. Griffin*, 178 Ill. 2d 65, 74 (1997). To show prejudice, "defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

¶ 81        In this matter, counsel moved for a new trial on the ground that a juror had contacted him and told counsel he was unaware he could maintain his verdict of not guilty. Counsel

unsuccessfully attempted to obtain an affidavit from the juror and advised the court of his efforts. Counsel did not subpoena the juror to testify and defendant faults counsel for doing so. However, even if counsel had subpoenaed the juror and the juror testified about his confusion regarding maintaining a not guilty verdict, the motion for new trial would still have been denied and thus, the outcome would have been the same. This is because "the use of affidavits or testimony to show 'the motive, method or process by which the jury reached its verdict' [i]s not permitted" to impeach the jury verdict. *People v Preston*, 76 Ill. 2d 274, 288 (1979) (quoting *People v. Holmes*, 69 Ill. 2d 507, 511 (1978)). Thus, defendant cannot establish prejudice and his claim of ineffective assistance of counsel fails.

¶ 82                                    III. CONCLUSION

¶ 83            The judgment of the circuit court of La Salle County is affirmed.

¶ 84            Affirmed.